**No. 2025-1236**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

EXELIXIS, INC.,

*Plaintiff-Appellee,*

*v.*

MSN LABORATORIES PRIVATE LTD., MSN PHARMACEUTICALS, INC.,

*Defendants-Appellants.*

On Appeal from the United States District Court for the District of Delaware in
Case No. 1:22-cv-00228-RGA, Judge Richard G. Andrews

**PLAINTIFF-APPELLEE EXELIXIS, INC.'S NON-CONFIDENTIAL
OPPOSITION TO DEFENDANTS-APPELLANTS' MOTION TO DISMISS
APPEAL AS MOOT AND TO VACATE UNDERLYING DECISION**

LISA J. PIROZZOLO
KEVIN S. PRUSSIA
MADELEINE C. LAUPHEIMER
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

THOMAS G. SAUNDERS
AMY K. WIGMORE
GERARD A. SALVATORE
BELLA M. WALKER
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 663-6000

*Counsel for Plaintiff-Appellee
Exelixis, Inc.*

June 3, 2026

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION ...................................................................................................1

FACTUAL BACKGROUND ...................................................................................2

      A.    The District Court Case On Appeal ("*MSN II*") ...................................2

      B.    Concurrent Litigation ("*MSN III*") ......................................................2

      C.    This Appeal .............................................................................................6

ARGUMENT ...........................................................................................................8

I.      THERE REMAINS AN "ACTUAL CONTROVERSY" OVER THE ISSUES ON APPEAL BECAUSE THEY BEAR DIRECTLY ON THE VALIDITY OF THE '039 PATENT IN *MSN III* ...........................................8

II.     MSN'S ARGUMENTS TO THE CONTRARY ARE INCORRECT ...........................10

      A.    MSN's Cases Involving "Speculative" Issue Preclusion And Standing Are Inapposite ...................................................................10

      B.    The Presence Of Additional Defendants In *MSN III* Does Not Diminish MSN's Injury ...............................................................15

      C.    This Court Is Competent To Assess The Issue Preclusion Question Sufficiently To Determine Its Jurisdiction .........................15

III.    EVEN IF THE '349 PATENT APPEAL HERE IS MOOT, VACATUR SHOULD BE LIMITED TO THE FINDING OF NO INHERENCY ...........................17

CONCLUSION ......................................................................................................19

CERTIFICATE OF INTEREST

EXHIBITS

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

**CONFIDENTIAL MATERIAL OMITTED**

There is no confidential information in the opposition. The material omitted from Exhibit F concerns confidential experimental testing.

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Alabama Municipal Distributors Group v. Federal Energy Regulatory Commission*, 312 F.3d 470 (D.C. Cir. 2002)......................................................14

*Apple Inc. v. Voip-Pal.com, Inc.*,
976 F.3d 1316 (Fed. Cir. 2020) ......................................................... 15-16, 17

*Best Medical International, Inc. v. Elekta Inc.*,
46 F.4th 1346 (Fed. Cir. 2022) .......................................................13, 14

*Comcast Corp. v. International Trade Commission*,
951 F.3d 1301 (Fed. Cir. 2020) .................................................8, 9, 11

*DexCom, Inc. v. Abbott Diabetes Care, Inc.*,
89 F.4th 1370 (Fed. Cir. 2024) ........................................................9

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*,
528 U.S. 167 (2000)..........................................................12, 13

*Interactive Communications International, Inc. v. Blackhawk Network, Inc.*, No. 2025-1632, 2025 WL 2741614 (Fed. Cir. Sept. 26, 2025) (nonprecedential)........................................................10, 11, 13

*JTEKT Corp. v. GKN Automotive LTD.*,
898 F.3d 1217 (Fed. Cir. 2018) ........................................................11

*Karcher v. May*,
484 U.S. 72 (1987)..........................................................18

*MedImmune Inc. v. Genentech, Inc.*,
549 U.S. 118 (2007)..........................................................10

*National Iranian Oil Co. v. Mapco International, Inc.*,
983 F.2d 485 (3d Cir. 1992) ..........................................................8, 12

*U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership*,
513 U.S. 18 (1994)..........................................................17, 18

*United States v. Munsingwear, Inc.*,
    340 U.S. 36 (1950)........................................................................................17

*United Steel Paper & Forestry Rubber Manufacturing Allied
    Industrial & Service Workers International Union v. Virgin
    Islands*, 842 F.3d 201 (3d Cir. 2016)..........................................................8, 12

### DOCKETED CASES

*Exelixis v. MSN Laboratories Private Ltd., et al.*,
    No. 1:25-cv-00346-RGA (D. Del.)..................................................................4

### OTHER AUTHORITIES

13C Charles Alan Wright, Arthur R. Miller & Edward H. Cooper,
    Federal Practice and Procedure § 3533.3.1 (3d ed. 2008)....................................8

iv

**INTRODUCTION**

After Exelixis dropped its cross-appeal in light of ongoing litigation between the parties on a closely related patent that MSN does not dispute it infringes, MSN continued to challenge the district court's rejection of its inherency argument, noting the relevance of the ruling to the parallel proceeding. *See* MSN Reply Br. 6 n.2. Less than three days before oral argument, MSN changed course and argued that the district court's finding of no invalidity for U.S. Patent No. 11,298,349 should be vacated. Although an actual jurisdictional defect could not be waived, MSN was right the first time, and there is no jurisdictional defect here. The validity ruling MSN challenged on appeal precludes it from relitigating issues that it is actively pressing in the parallel proceeding. Accordingly, there remains a live controversy under the established principle that an appeal is not moot when it has collateral consequences for an ongoing proceeding.

Regardless, MSN's blanket request to vacate would fail even if there were any merit to its mootness argument, which there is not. MSN focused its '349 patent appeal on the single issue of inherency, declining to raise any challenge to the district court's rejection of MSN's other obviousness arguments. Whatever else happens, those unchallenged rulings cannot be vacated because it was MSN's own litigation decisions, not the subsequent dismissal of the cross-appeal, that prevented MSN from pressing the issues it declined to raise on appeal.

1

**FACTUAL BACKGROUND**

A.    **The District Court Case On Appeal ("*MSN II*")**

The '349 patent is directed to a pharmaceutical composition of cabozantinib (L)-malate that includes certain classes of excipients and is essentially free of a harmful genotoxic impurity (the "1-1 impurity"). Appx92 (34:30-51).

After a four-day bench trial, the district court found claim 3 of the '349 patent not infringed and not invalid. Appx2. The district court's noninfringement finding rested exclusively on its determination that Exelixis had not established that MSN's ANDA products practiced the '349 patent's "glidant" limitation. Appx19. As for the validity of the '349 patent, the district court addressed and rejected two separate invalidity arguments made by MSN—(1) that Brown inherently produced cabozantinib (L)-malate essentially free of the 1-1 impurity, and (2) that a POSA would have been motivated to modify Brown to make cabozantinib (L)-malate essentially free of the 1-1 impurity with a reasonable expectation of success. In reaching these conclusions, the district court made a significant number of key findings of fact. *See* Appx45-48.

B.    **Concurrent Litigation ("*MSN III*")**

On October 29, 2024, the U.S. Patent Office issued U.S. Patent No. 12,128,039. The '039 patent is a continuation of the '349 patent. Ex. A ('039 patent). Asserted claim 1 of the '039 patent is very similar to claim 3 of the '349

2

patent. They both claim pharmaceutical compositions for the oral administration of cabozantinib (L)-malate with low quantities of the 1-1 impurity. Claim 1 of the '039 patent differs only insofar as it (1) does not require a "glidant" (the limitation MSN was found not to infringe in *MSN II*) or other specific excipient classes, and (2) it requires 100 ppm or less of the 1-1 impurity (instead of the 200 ppm-or-less threshold in the '349 patent).

### Claim 1 of the '039 Patent

1. A pharmaceutical composition for oral administration comprising Compound IB:

and a pharmaceutically acceptable carrier, wherein the pharmaceutical composition is a tablet or a capsule, and

wherein the pharmaceutical composition contains 100 ppm or less of 6,7-dimethoxy-quinoline-4-ol.

Ex. A at 34:2-25 ('039 patent, claim 1).

### Claim 3 of the '349 Patent

3. A pharmaceutical composition for oral administration comprising Compound IB:

3

> one or more fillers; one or more disintegrants; one or more glidants; and one or more lubricants, wherein the pharmaceutical composition is a tablet or capsule pharmaceutical composition; and
>
> wherein the pharmaceutical composition is essentially free of 6,7-dimethoxy-quinoline-4-ol.

Appx92; *see also* Appx45 (recognizing that "'essentially free' is defined as 200 ppm or less").

Exelixis sued MSN for infringement of several claims of the '039 patent on March 19, 2025, before any briefs were filed in this appeal. *Exelixis v. MSN Lab'ys Priv. Ltd., et al.*, No. 1:25-cv-00346-RGA (D. Del.) ("*MSN III*"). Because the absence of a "glidant" limitation eliminated the sole basis on which the district court found noninfringement of claim 3 of the '349 patent, MSN stipulated to infringement of the '039 patent claims.

In arguing that the asserted claims of the '039 patent are invalid, MSN has presented numerous arguments that conflict with—and are precluded by—the district court's rulings on the '349 patent, including a live dispute in the concurrent litigation regarding the core issues in MSN's inherency appeal. For example, in

4

the case on appeal here, the district court found that "MSN has not shown by clear and convincing evidence that if the Brown process is followed, it will result in cabozantinib (L)-malate API essentially free of the 1-1 impurity." Appx46. But in the parallel proceeding, MSN's expert is arguing that "if a POSA faithfully follows the Brown Process, as Regis did, the POSA would necessarily and inherently obtain cabozantinib (L)-malate containing 200 ppm or less, 100 ppm or less, and/or 50 ppm or less of the 1-1 Impurity." Ex. B ¶ 171 (Dichtel Rep.); *see also id.* ¶ 152 (Dichtel Rep.) ("the synthesis of cabozantinib (L)-malate prepared by the Brown process … inherently yields cabozantinib (L)-malate containing the 1-1 Impurity at levels satisfying certain of the claimed impurity limitations."); *id.* ¶ 180 (Dichtel Rep.) ("Three batches prepared by Regis confirm that the Brown Process inherently produces cabozantinib (L)-malate containing 200 ppm or less ….").

Similarly, the district court found that "[t]he Regis batches did not follow the Brown experimental process." Appx46. But in the parallel proceeding, MSN's expert is arguing that "each of the three Regis Batches faithfully followed the Brown Process." Ex. B ¶ 181 (Dichtel Rep.).

Similar conflicts abound on other issues:

| District Court Finding in *MSN II* | MSN's Position in *MSN III* |
|---|---|
| "A POSA would not be motivated to add a recrystallization step at the end of | "A POSA would have been motivated with a reasonable expectation of success to employ recrystallization to purge any 1-1 impurity from the |

| | |
|---|---|
| the Brown process to remove the impurity ….” Appx46. | cabozantinib (L)-malate drug substance manufactured according to the Brown process …” Ex. C ¶ 166 (Steed Rep.). |
| “Recrystallization could also produce more 1-1 impurity through ‘decomposition.’” Appx46. | “[A] POSA would not expect any degradation of the cabozantinib molecule during the recrystallization.” Ex. C ¶ 195 (Steed Rep.) |
| “A POSA would not be motivated to obtain a cabozantinib (L)-malate formulation essentially free of the 1-1 impurity.” Appx46. | “[A] POSA would have been motivated and found it obvious to prepare a pharmaceutical composition wherein the final drug product remains at 200 ppm or less … [of the 1-1 impurity].” Ex. D ¶ 230 (Donovan Rep.). |

## C.    This Appeal

On the ’349 patent, MSN’s opening brief in this appeal challenged only the district court’s rejection of MSN’s inherency argument.  MSN did not challenge any of the district court’s other validity rulings on the ’349 patent.  Appx51-56. MSN thus gave up its right to challenge those other findings even before Exelixis dropped its cross-appeal on infringement of the ’349 patent.

After MSN filed its opening brief, Exelixis decided not to pursue its cross-appeal so as not to burden this Court with arguments on the “glidant” limitation given MSN’s infringement of a similar patent without that limitation.  Exelixis filed an unopposed motion to dismiss the cross-appeal on June 5, 2025, noting that the motion “does not affect” MSN’s appeal.  ECF 26.  The Court granted that motion on June 10, 2025.  ECF 27.

6

Exelixis' appeal brief addressed the merits of the '349 patent's validity in detail.  Exelixis Br. 53-65.  In its reply brief, MSN likewise responded on the merits and expressly recognized the ongoing controversy, despite the fact that Exelixis dropped its cross-appeal, explaining:

> Since the judgment [in *MSN II*], however, Exelixis has obtained and asserted a continuation patent that omits the '349 patent's "glidant" limitation, which was the basis for the district court's noninfringement rule.  *See* No. 1:25-cv-00346-RGA (D. Del., filed Mar. 19, 2025).  ***MSN thus maintains its obviousness challenge to the '349 patent, which may be relevant to the new continuation patent.***

MSN Reply Br. 6 n.2 (emphasis added).

On May 28, 2026, this Court issued an order requesting that the parties "come to argument prepared to discuss whether Appellants have Article III standing to appeal the final judgment of no invalidity for claim 3 of U.S. Patent No. 11,298,349."  ECF 61 at 2.  On May 30, 2026—nearly ten months after filing its reply brief, and mere days before oral argument—MSN indicated for the first time that it thought the district court's ruling on the validity of claim 3 of the '349 patent should be vacated.  Following further exchanges between the parties, MSN filed its motion to dismiss on June 1.  ECF 63 ("Mot.").

## ARGUMENT

**I.    THERE REMAINS AN "ACTUAL CONTROVERSY" OVER THE ISSUES ON APPEAL BECAUSE THEY BEAR DIRECTLY ON THE VALIDITY OF THE '039 PATENT IN *MSN III***

MSN has standing to appeal the district court's judgment of no invalidity, and there remains a live case or controversy that has not been mooted by the dismissal of Exelixis's cross-appeal, because the challenged ruling directly affects ongoing disputes on the same issues in *MSN III*.  This case is therefore governed by the well-established principle that a court of appeals maintains jurisdiction to decide issues that have potential collateral consequences affecting other ongoing proceedings.  *See, e.g.*, *National Iranian Oil Co. v. Mapco Int'l, Inc.*, 983 F.2d 485, 490 (3d Cir. 1992) ("[I]f a trial court's order will have possible collateral legal consequences, a case is not moot."); *United Steel Paper & Forestry Rubber Mfg. Allied Indus. & Serv. Workers Int'l Union v. Virgin Islands*, 842 F.3d 201, 209-210 (3d Cir. 2016) (same); 13C Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3533.3.1 (3d ed. 2008) (discussing collateral consequences exception to mootness).

That is equally true in the context of patent infringement, where this Court has held that collateral effects on currently pending litigation are sufficient to keep an appeal from being mooted by lack of infringement.  For example, in *Comcast Corp. v. International Trade Commission*, 951 F.3d 1301 (Fed. Cir. 2020), this Court held that an appeal was not moot, even though expiration of the patents

required termination of the ITC's partial exclusion order, because the rulings on appeal remained relevant to two other ongoing ITC investigations involving unexpired patents related to the same products. *Id*. at 1306-1307.  The Court explained that "[i]t is recognized that a case may remain alive based on collateral consequences, which may be found in the prospect that a judgment will affect future litigation or administrative action." *Id*. at 1307 (quotation marks omitted).

Similarly, in *DexCom, Inc. v. Abbott Diabetes Care, Inc.*, 89 F.4th 1370 (Fed. Cir. 2024), this Court held that DexCom's argument that a forum selection clause precluded Abbott from filing IPRs was not moot even after DexCom won the IPR because of "the potential for DexCom to challenge Abbott's ability to file and participate in inter partes reviews in the future." *Id*. at 1372 n.1.

Here, MSN is taking positions in the concurrent litigation on the '039 patent that directly conflict with the district court's rulings on the '349 patent. *See supra* pp. 5-6.  MSN's challenge to those rulings in this appeal therefore presents a live controversy, independent of any infringement claim on the '349 patent, because the collateral estoppel effect of the challenged judgment has an immediate, ongoing effect on the legal interests of the parties.  MSN's failure to prove that Brown inherently produces cabozantinib with less than 200 ppm of the 1-1 impurity in the case on appeal necessarily means that it failed to prove that Brown inherently produces cabozantinib with even lower amounts of the 1-1 impurity.  Likewise,

9

many of the district court's specific factual findings at issue in this appeal preclude MSN from making contradictory arguments in the concurrent litigation.

There is thus "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality." *MedImmune Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007).  And the ongoing dispute means there is a continuing interest sufficient to defeat a suggestion of mootness.

Indeed, MSN has confirmed that it wishes to continue litigating the same questions at issue in this appeal.  When MSN announced its new position on mootness, Exelixis inquired whether MSN was "offering to stipulate that it will not relitigate any specific issues decided by the district court in connection with the '349 patent."  Ex. E at 2 (June 1, 2026 email).  MSN declined, confirming that the dispute between the parties on the issues before this Court remains live.  *Id*. at 1 ("[W]e understand MSN's position to be that it will not agree to any outcome that limits its ability to relitigate validity-related issues decided by the district court in connection with the '349 patent.").

## II.   MSN'S ARGUMENTS TO THE CONTRARY ARE INCORRECT

### A.   MSN's Cases Involving "Speculative" Issue Preclusion And Standing Are Inapposite

MSN contends that the "'potential for collateral consequences of a decision'" is not "'a sufficient basis, on its own, to confer standing.'"  Mot. 5 (quoting *Interactive Commc'ns Int'l, Inc. v. Blackhawk Network, Inc.*, No. 2025-

1632, 2025 WL 2741614, at *2 (Fed. Cir. Sept. 26, 2025)).  But MSN's cases are distinguishable for multiple reasons.

*First*, general statements that collateral consequences are insufficient to establish Article III standing typically arise in the context of cases where there is no clear prospect of further proceedings.  For example, in *Interactive Communications*, this Court held that an IPR petitioner asserting "potential infringement activity" had no standing to challenge a final written decision of no invalidity because the petitioner failed to "'establish that it has concrete plans for future activity that creates a substantial risk of future infringement or likely cause the patentee to assert a claim of infringement.'"  2025 WL 2741614, at *2 (quoting *JTEKT Corp. v. GKN Auto. LTD*., 898 F.3d 1217, 1221 (Fed. Cir. 2018)).  The "potential" for collateral estoppel there involved a completely *hypothetical* future litigation—there was no pending proceeding and no activity likely to lead to a future suit.

Here, by contrast, there is an active lawsuit on a closely related patent where MSN has already confirmed that it seeks to relitigate the same issues on which the district court already ruled against it.  This case is therefore similar to *Comcast*, in which the appeal was not moot because there were already pending parallel proceedings that would be impacted by the disputed issue on appeal.  951 F.3d at 1306-1307.  It also resembles *National Iranian Oil* where the appeal was not moot

11

because the plaintiff "filed two other lawsuits … for breach of the same contract" and the statute of limitations ruling on appeal "would have a collateral estoppel effect in those actions." 983 F.2d at 490.[1] Similarly, in *United Steel Paper*, the expiration of a challenged law did not moot a Contract Clause suit, despite eliminating the possibility of a direct remedy, because "the District Court's holding that [the law] does not violate the Contract Clause will have collateral legal consequences on the binding arbitration between the [parties]." 842 F.3d at 209.

The collateral consequences here do not involve a hypothetical future dispute that may never arise. They affect an ongoing legal proceeding that was being actively litigated before Exelixis dropped its cross-appeal and remains a live dispute today.

***Second***, MSN's principal cases relate to standing, but its motion is really about mootness. Although the two doctrines overlap in many respects, the Supreme Court has made clear that there are important distinctions. For example, "there are circumstances in which the prospect that a defendant will engage in … harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness." *Friends of the Earth, Inc. v. Laidlaw Env't*

---

[1] Although a speculative possibility of recovering money damages also remained in *National Iranian Oil*, the Third Circuit made clear that the collateral impact on other cases provided an independent basis for concluding that the appeal was not moot. *See* 983 F.2d at 490.

*Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000).  Similarly, general statements that collateral consequences are insufficient to *establish standing* in the first instance do not mean they are insufficient to *defeat mootness*.  The quotes MSN offers for the proposition that collateral consequences are not enough to establish standing thus do not negate the holding of *Comcast* and other cases that clearly show collateral consequences are sufficient to defeat mootness.[2]

For example, in *Interactive Communications*, the question was not whether to vacate the Board's decision due to mootness.  The problem was that the case never properly made it in the door of federal court in the first place because, from the outset, there was no standing.  2025 WL 2741614, at *2.

In *Best Medical International, Inc. v. Elekta Inc.*, 46 F.4th 1346 (Fed. Cir. 2022), the patent owner lacked standing because it was seeking to appeal a final written decision declaring a claim unpatentable even though the patent owner had voluntarily cancelled that claim ***before filing its notice of appeal***.  *Id*. at 1352.  In that unusual posture, the fact that an Examiner had followed the reasoning of the unappealable IPR decision in another proceeding was not sufficient to establish

---

[2]    The Supreme Court also explained that standing doctrine ensures "the scarce resources of the federal courts are devoted to those disputes in which the parties have a concrete stake.  In contrast, by the time mootness is an issue, the case has been brought and litigated, often … for years.  To abandon the case at an advanced stage may prove more wasteful than frugal."  528 U.S. at 191-192.

standing. *Id*. Nor was the Examiner's view that it was "bound" properly based on collateral estoppel, leaving the patent owner free to challenge all findings in the second proceeding. *Id*. at 1352-1353.

In *Alabama Municipal Distributors Group v. FERC*, 312 F.3d 470 (D.C. Cir. 2002), the petitioner likewise never made it in the door of federal court because it lacked standing. Not only did it fail to show that FERC's decision to award a pipeline certificate would harm it, but it was likely "to reduce petitioners' rates." 312 F.3d at 472. Against that backdrop, speculation that the order might harm it if extended in a future rate case—which had not yet commenced—was insufficient to establish standing. *Id*. at 473-474. Moreover, in the context of judicial review of an administrative decision, the D.C. Circuit explained that whatever the "precedential effect *within the Commission*," "in court petitioners will be able to point to any errors in the present agency action that prove to affect their interests adversely in the rate case." *Id*.

In short, MSN's three principal cases are not on point. None held that collateral consequences are insufficient to defeat *mootness*. None *vacated* a decision. And none involved a direct impact on an ongoing proceeding in a circumstance where collateral estoppel applies.

14

**B.      The Presence Of Additional Defendants In *MSN III* Does Not Diminish MSN's Injury**

MSN's argument regarding the other defendant in the parallel case is a red herring.  Regardless of whether Azurity is subject to issue preclusion, issue preclusion would still prevent *MSN* from making the same arguments that it did in the previous case.  There is nothing "hypothetical and abstract" (Mot. 6) about the ongoing nature of that dispute.  A collateral consequence does not have to definitely resolve all litigation, including disputes with third parties, in order to establish the continued existence of a live case or controversy.

If there were truly no harm to MSN given Azurity's presence in the suit, MSN would have had no difficulty assuring Exelixis that it did not intend to relitigate the questions already decided in this case, but MSN refused to do so. Ex. E at 1-2.

Further, even if Azurity's presence were somehow relevant, it is speculative that it would continue to make the same dubious arguments MSN has already lost on if the Court affirms the *MSN II* judgment.

**C.      This Court Is Competent To Assess The Issue Preclusion Question Sufficiently To Determine Its Jurisdiction**

Finally, MSN contends that this Court is "ill-suited to speculate" as to the collateral consequences of the judgment on the '349 patent, and that that question "'must be decided' in the follow-on suit."  Mot. at 7 (quoting *Apple Inc. v. Voip-*

*Pal.com, Inc.*, 976 F.3d 1316, 1322 (Fed. Cir. 2020)).  But that misstates the question before the Court:  the Court need not definitively ***determine*** whether or not collateral estoppel ***will*** apply in *MSN III*.  The Court need only determine that the potential for such collateral consequences is sufficient to mean that there is a live controversy.

Here, there can be no question that there is a controversy over the application and scope of issue preclusion in this case.  In *MSN III*, Exelixis and MSN have exchanged detailed letters over this issue.  The only reason Exelixis has yet to tee up a ruling on issue preclusion in the district court is that ***MSN urged Exelixis to wait pending the outcome of this appeal***.  Ex. F at 1, ¶ 2 (May 18, 2026 email from Cox to Boyle, stating "[i]t is your position that, as the appeal in *Exelixis, Inc. v. MSN Lab'ys Private Ltd. et al.*, C.A. No. 22-228-RGA, remains pending, and expert discovery is still ongoing, the issue of collateral estoppel is not yet ripe to raise with the Court").  MSN thus recognized the ongoing dispute in this appeal and its impact on the parallel proceeding, and Exelixis relied on that shared understanding.

The *Apple* case does not compel a different conclusion regarding the role of collateral estoppel.  There, this Court was not considering whether collateral consequences in another case preserved a live case or controversy but rather was considering whether a ruling in a different case mooted the dispute on appeal.  The

16

Court held that Apple's appeal of an IPR determination that certain claims were not unpatentable was *not* moot, despite Apple's argument that claim preclusion would prevent Apple from ever being accused of infringing those claims, because the Court was unwilling to determine what the outcome of a claim preclusion argument would be in a subsequent hypothetical case that had not been filed. 976 F.3d at 1322. In other words, the Court could determine its jurisdiction in the case before it without reaching the ultimate question of what the effect of the collateral consequences would be in the future. The same is true here.

### III. EVEN IF THE '349 PATENT APPEAL HERE IS MOOT, VACATUR SHOULD BE LIMITED TO THE FINDING OF NO INHERENCY

Even if the Court agrees with MSN that the '349 patent appeal is moot, the scope of vacatur MSN proposes—vacatur of the district court's finding that MSN failed to prove by a preponderance of the evidence that the '349 patent is invalid, Mot. 9-10—is too broad. At most, vacatur should be limited to the district court's finding that MSN failed to show that Brown inherently discloses cabozantinib (L)-malate essentially free of the 1-1 impurity.

Vacatur under *Munsingwear*—to the extent it is appropriate at all—is only proper where review of the underlying district court decision was "prevented through happenstance," *United States v. Munsingwear, Inc.*, 340 U.S. 36, 40 (1950), or "frustrated by the vagaries of circumstance," *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 25 (1994). It is not available when a party's own

17

actions cause the judgment below to become unreviewable. *See U.S. Bancorp*, 513 U.S. at 25; *Karcher v. May*, 484 U.S. 72, 83 (1987) (no vacatur where "the losing party … declined to pursue its appeal").

Here, every aspect of the district court's decision on the validity of the '349 patent except the finding of no inherency was made unreviewable by MSN's own actions—namely, MSN's failure to challenge those other rulings in its opening appeal brief. While MSN contends that this Court lost jurisdiction to review the district court's judgment of invalidity when Exelixis dropped its cross appeal, MSN agrees that, "[a]t the outset of this appeal … Article III standing existed regarding the validity of the '349 patent." Mot. 1. Thus, at the time that MSN filed its opening brief, the cross-appeal was still live and this Court undisputedly had jurisdiction, yet the only issue MSN briefed on appeal was inherency. *See* MSN Opening Br. at 61-76. Any alleged error in the district court's finding that it would not have been obvious for a skilled artisan to modify Brown to obtain a formulation of cabozantinib (L)-malate essentially free of the 1-1 impurity (Appx51-67) was forfeited. MSN cannot now leverage Exelixis's voluntary dismissal of the cross-appeal to gain a do-over of issues for which it chose not to seek review.

## CONCLUSION

For the foregoing reasons, Exelixis respectfully requests that the Court deny MSN's motion to partially dismiss and vacate, and instead reach the merits of the '349 patent's validity.  In the alternative, Exelixis requests that any vacatur be limited to the district court's findings on inherency.

Respectfully submitted,

/s/ Thomas G. Saunders

| | |
|---|---|
| LISA J. PIROZZOLO | THOMAS G. SAUNDERS |
| KEVIN S. PRUSSIA | AMY K. WIGMORE |
| MADELEINE C. LAUPHEIMER | GERARD A. SALVATORE |
| WILMER CUTLER PICKERING | BELLA M. WALKER |
|    HALE AND DORR LLP | WILMER CUTLER PICKERING |
| 60 State Street |    HALE AND DORR LLP |
| Boston, MA  02109 | 2100 Pennsylvania Avenue, NW |
| (617) 526-6000 | Washington, DC  20037 |
| | (202) 663-6000 |

*Counsel for Plaintiff-Appellee Exelixis, Inc.*

June 3, 2026

## CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellee Exelixis, Inc. certifies the following:

**1.     Represented Entities**.  Fed. Cir. R. 47.4(a)(1).  Provide the full names of all entities represented by undersigned counsel in this case.

Exelixis, Inc.

**2.     Real Party in Interest**.  Fed. Cir. R. 47.4(a)(2).  Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.

None.

**3.     Parent Corporations and Stockholders**.  Fed. Cir. R. 47.4(a)(3).  Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

None.

**4.     Legal Representatives**.  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

WILMER CUTLER PICKERING HALE AND DORR LLP:  Timothy A. Cook, Jonathan A. Cox, Katherine P. Kieckhafer (former), Marissa A. Lalli, William F. Lee, Amy L. Mahan, Cristina Salcedo, Labdhi Sheth (former), Emily R. Whelan, Kevin M. Yurkerwich (former)

MORRIS, NICHOLS, ARSHT & TUNNELL LLP:  Jack B. Blumenfeld, Anthony D. Raucci

**5.** **Related Cases**. Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

X  Yes (file separate notice; see below)      ☐ No    ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). Please do not duplicate information. This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

Already filed.

**6.** **Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

None.

Dated: June 3, 2026                    /s/ Thomas G. Saunders
                                       THOMAS G. SAUNDERS
                                       WILMER CUTLER PICKERING
                                         HALE AND DORR LLP
                                       2100 Pennsylvania Avenue, NW
                                       Washington, DC 20037
                                       (202) 663-6000

# EXHIBITS

## TABLE OF CONTENTS

| Exhibit No. | Description |
| --- | --- |
| Exhibit A | U.S. Patent No. 12,128,039 |
| Exhibit B | Excerpts from the Opening Expert Report of William Dichtel, Ph.D. Regarding Invalidity of U.S. Patent Nos. 11,298,349 and 12,128,039 (Apr. 23, 2026) |
| Exhibit C | Excerpts from the Opening Expert Report of Jonathan Steed, Ph.D. Related to Invalidity of the Asserted Claims of U.S. Patent Nos. 11,298,349 and 12,128,039 (Apr. 23, 2026) |
| Exhibit D | Excerpts from the Opening Expert Report of Dr. Maureen Donovan Regarding Invalidity of U.S. Patent Nos. 11,298,349 and 12,128,039 (Apr. 23, 2026) |
| Exhibit E | Email chain between Tom Saunders to Kevin Boyle, dated June 1, 2026 regarding MSN's proposed motion to dismiss. |
| Exhibit F | Excerpts from email chain between Jonathan Cox and Kevin Boyle from May 1, 2026 through May 18, 2026 regarding disputes related to MSN's expert reports in *Exelixis v. MSN Labys. Priv. Ltd., et al.*, No. 1:25-cv-00346-RGA (D. Del.) **[FILED UNDER SEAL]** |

i

# EXHIBIT A



US012128039B2

(12) **United States Patent**
Wilson et al.

(10) **Patent No.:**     **US 12,128,039 B2**
(45) **Date of Patent:**        *Oct. 29, 2024

(54) **PROCESSES FOR PREPARING QUINOLINE COMPOUNDS AND PHARMACEUTICAL COMPOSITIONS CONTAINING SUCH COMPOUNDS**

(71) Applicant: **Exelixis, Inc.**, Alameda, CA (US)

(72) Inventors: **Jo Ann Wilson**, San Francisco, CA (US); **Khalid Shah**, Half Moon Bay, CA (US)

(73) Assignee: **Exelixis, Inc.**, Alameda, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **18/436,836**

(22) Filed: **Feb. 8, 2024**

(65) **Prior Publication Data**

US 2024/0189298 A1     Jun. 13, 2024

**Related U.S. Application Data**

(60) Continuation of application No. 18/462,739, filed on Sep. 7, 2023, which is a continuation of application No. 17/679,634, filed on Feb. 24, 2022, now abandoned, which is a continuation of application No. 17/170,275, filed on Feb. 8, 2021, now Pat. No. 11,298,349, which is a continuation of application No. 17/152,394, filed on Jan. 19, 2021, now abandoned, which is a continuation of application No. 16/706,323, filed on Dec. 6, 2019, now abandoned, which is a division of application No. 16/151,653, filed on Oct. 4, 2018, now Pat. No. 10,543,206, which is a division of application No. 15/348,716, filed on Nov. 10, 2016, now Pat. No. 10,123,999, which is a division of application No. 13/984,559, filed as application No. PCT/US2012/024591 on Feb. 10, 2012, now Pat. No. 9,717,720.

(60) Provisional application No. 61/441,520, filed on Feb. 10, 2011, provisional application No. 61/441,527, filed on Feb. 10, 2011.

(51) **Int. Cl.**
    ***A61K 31/47***        (2006.01)
    ***C07D 215/233***      (2006.01)

(52) **U.S. Cl.**
    CPC .......... ***A61K 31/47*** (2013.01); ***C07D 215/233*** (2013.01)

(58) **Field of Classification Search**
    CPC ......................... C07D 2158/233; A61K 31/47
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,358,941 A | 10/1994 | Bechard et al. | |
| 6,030,643 A | 2/2000 | Adams et al. | |
| 7,166,722 B2 | 1/2007 | Matsunaga et al. | |
| 7,169,789 B2 | 1/2007 | Kubo et al. | |
| 7,579,473 B2 | 8/2009 | Bannen et al. | |
| 7,977,345 B2 | 7/2011 | Bannen et al. | |
| 7,999,006 B2 | 8/2011 | Lamb | |
| 8,067,436 B2 | 11/2011 | Bannen et al. | |
| 8,178,532 B2 | 5/2012 | Bannen et al. | |
| 8,314,232 B2 | 11/2012 | Deschamps et al. | |
| 8,476,298 B2 | 7/2013 | Bannen et al. | |
| 8,497,284 B2 | 7/2013 | Bannen et al. | |
| 8,673,912 B2 | 3/2014 | Cannon et al. | |
| 8,877,776 B2 * | 11/2014 | Brown | A61P 5/14 514/312 |
| 9,174,947 B2 | 11/2015 | Bannen et al. | |
| 9,365,516 B2 | 6/2016 | Wilson et al. | |
| 9,717,720 B2 * | 8/2017 | Wilson | A61K 31/47 |
| 9,724,342 B2 | 8/2017 | Wilson et al. | |
| 9,809,549 B2 | 11/2017 | Brown et al. | |
| 9,969,692 B2 | 5/2018 | Wilson et al. | |
| 10,034,873 B2 | 7/2018 | Wilson et al. | |
| 10,039,757 B2 | 9/2018 | Wilson et al. | |
| 10,123,999 B2 | 11/2018 | Wilson et al. | |
| 10,166,225 B2 | 1/2019 | Aftab et al. | |
| 11,091,439 B2 * | 8/2021 | Brown | A61P 5/14 |
| 11,091,440 B2 * | 8/2021 | Brown | A61P 43/00 |
| 11,098,015 B2 | 8/2021 | Brown et al. | |
| 11,298,349 B2 * | 4/2022 | Wilson | A61P 35/00 |
| 11,433,064 B2 * | 9/2022 | Aftab | A61K 45/06 |
| 11,504,362 B2 * | 11/2022 | Shah | A61K 9/0095 |
| 12,016,854 B2 * | 6/2024 | Shah | A61K 31/47 |
| 2005/0049267 A1 | 3/2005 | Suto et al. | |
| 2005/0209247 A1 | 9/2005 | Cai et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | 2005030140 | 4/2005 |
| WO | 2009136663 | 11/2009 |

(Continued)

OTHER PUBLICATIONS

Kurzrock R et al. "379 Poster A phase I study of XL 184, a MET, VEGFR2, and RET kinase inhibitor, administered orally to patients (pts) with advanced malignancies, including a subgroup of pts with medullary thyroid cancer (MTC)." Eropean journal of cancer. supplement, vol. 6, No. 12, Oct. 1, 2008, 119.

European Medicines Agency, "Specifications: Test procedures and acceptance criteria for new drug substances and new drug products: chemical substances", May 2000.

(Continued)

*Primary Examiner* — D Margaret M Seaman

(74) *Attorney, Agent, or Firm* — Honigman LLP; Heidi M. Berven; Li Gao

(57)        **ABSTRACT**

The present invention is directed to processes for making and compositions containing quinolines such as formula I or pharmaceutically acceptable salts thereof wherein: X1 is H, Br, CI, or X2 is H, Br, CI, or n1 is 1-2; and n2 is 1-2.

**22 Claims, No Drawings**

US 12,128,039 B2

Page 2

## (56) References Cited

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2007/0054928 A1 | 3/2007 | Bannen et al. |
| 2007/0078159 A1 | 4/2007 | Matsushima et al. |
| 2008/0004273 A1 | 1/2008 | Raeppel et al. |
| 2008/0161305 A1 | 7/2008 | Forsyth et al. |
| 2009/0203729 A1 | 8/2009 | Inoue et al. |
| 2009/0274693 A1 | 11/2009 | Gilmer et al. |
| 2011/0059081 A1 | 3/2011 | Bacus |
| 2011/0077233 A1 | 3/2011 | Bannen et al. |
| 2012/0070368 A1 | 3/2012 | Bannen et al. |
| 2012/0184523 A1 | 7/2012 | Bannen et al. |
| 2012/0252840 A1 | 10/2012 | Aftab et al. |
| 2012/0282179 A1 | 11/2012 | Aftab et al. |
| 2013/0030172 A1 | 1/2013 | Wilson et al. |
| 2013/0142790 A1 | 6/2013 | Gilmer et al. |
| 2013/0143881 A1 | 6/2013 | Cannon et al. |
| 2013/0150363 A1 | 6/2013 | Gilmer et al. |
| 2013/0197230 A1 | 8/2013 | Wilson et al. |
| 2013/0252940 A1 | 9/2013 | Bannen et al. |
| 2013/0252956 A1 | 9/2013 | Kallender et al. |
| 2013/0330377 A1 | 12/2013 | Wilson |
| 2013/0337015 A1 | 12/2013 | Wilson |
| 2014/0057908 A1 | 2/2014 | Smith |
| 2014/0057943 A1 | 2/2014 | Smith |
| 2014/0066444 A1 | 3/2014 | Smith et al. |
| 2014/0121239 A1 | 5/2014 | Aftab et al. |
| 2014/0155396 A1 | 6/2014 | Bannen et al. |
| 2014/0179736 A1 | 6/2014 | Schwab et al. |
| 2014/0200242 A1 | 7/2014 | Wilson |
| 2014/0221372 A1 | 8/2014 | Kulkarni et al. |
| 2014/0228401 A1 | 8/2014 | Aftab et al. |
| 2014/0256938 A1 | 9/2014 | Wison et al. |
| 2014/0302012 A1 | 10/2014 | DeCillis et al. |
| 2014/0323522 A1 | 10/2014 | Aftab et al. |
| 2015/0057310 A1 | 2/2015 | Brown et al. |
| 2015/0133494 A1 | 5/2015 | Aftab et al. |
| 2015/0196545 A1 | 7/2015 | Aftab et al. |
| 2015/0202196 A1 | 7/2015 | Bannen et al. |
| 2015/0238477 A1 | 8/2015 | Aftab |
| 2015/0376133 A1 | 12/2015 | Bannen et al. |
| 2016/0000772 A1 | 1/2016 | Aftab et al. |
| 2016/0031818 A1 | 2/2016 | Aftab et al. |
| 2016/0051532 A1 | 2/2016 | Aftab et al. |
| 2016/0082019 A1 | 3/2016 | Sweeney et al. |
| 2016/0185725 A1 | 6/2016 | Bannen et al. |
| 2016/0220554 A1 | 8/2016 | Smith et al. |
| 2016/0229805 A1 | 8/2016 | Wilson et al. |
| 2017/0057921 A1 | 3/2017 | Wilson et al. |
| 2017/0087143 A1 | 3/2017 | Aftab et al. |
| 2017/0143689 A1 | 5/2017 | Wilson et al. |
| 2017/0266178 A1 | 9/2017 | Wilson et al. |
| 2017/0275251 A1 | 9/2017 | Brown et al. |
| 2017/0355678 A1 | 12/2017 | Bannen et al. |
| 2018/0002289 A1 | 1/2018 | Brown et al. |
| 2018/0037552 A1 | 2/2018 | Brown et al. |
| 2018/0230100 A1 | 8/2018 | Wilson et al. |
| 2018/0311229 A1 | 11/2018 | Wilson et al. |
| 2019/0030021 A1 | 1/2019 | Wilson et al. |
| 2019/0091215 A1 | 3/2019 | Aftab et al. |
| 2019/0151302 A1 | 5/2019 | Aftab et al. |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | 2010083414 | 7/2010 |
| WO | 2010113183 | 10/2010 |
| WO | 2011017639 | 2/2011 |
| WO | 2012009722 | 1/2012 |
| WO | 2012109510 | 6/2012 |

### OTHER PUBLICATIONS

Sigma-Aldrich Corporation, "Cabozantinib Material Safety Data Sheet", Version 5.0, Oct. 20, 2014, retrieved from the internet at http://www.sigmaaldrich.com/MSDS/MSDS/DisplayMSDSPage.do?country=US&language=en&productNumber=CDS009101&brand=ALDRICH&PageToGoToURL=http%3A%2F%2Fwww.sigmaaldrich.com%2Fcatalog%2Fproduct%2Faldrich%2Fcds009101%3Flang%3Den on Oct. 1, 2015.

United States Department of Health and Human Services, "Guidance for Industry Q1A(R2) Stability Testing of New Drug Substances and Products", Revision 2, Nov. 2003, retrieved from the internet at www.fda.gov/downloads/drugs/guidancecomplianceregulatory information/guidances/ucm073369.pdf on Oct. 1, 2015.

International Search Report for PCT/US2012/024591, mailed May 25, 2012.

Kibbe, A.H. Handbook of Pharmaceutical Excipients, 3rd edition: American Pharmactical Association and Pharmaceutical Press, ISBN 0-85369-381-1, 2000 (pp. 110,244,305,143,102,501,534,386,160).

Li, Lubricants, 2014, vol. 2, 21-43. (Year: 2014).

"Overview of PHarmaceutical Excipients Used in Tablets and Capsules", 2008, Drug Topics, https://www.drugtopics.com/view/overview-pharmaceutical-excipients-used-tablets-and-capsules. (Year: 2008).

Pingali, Int J Pharm, 2011, vol. 409(0), 269-277. (Year: 2011).

United States Department of Health and Human Services, "Guidance for Industry Q1A(R2) Stability Testing of New Drug Substances and Products", Revision 2, Nov. 2003, retrieved from the internet at https://www.fda.gov/media/71707/download on Jan. 19, 2022.

United States Department of Health and Human Services, "Guidance for Industry Q3B(R2) Impurities in New Drug Products", Revision 2, Aug. 2006, retrieved from the internet at https://www.fda.gov/media/71733/download on Jan. 19, 2022.

Zhang, Y., et al., "XL-184, a MET, VEGFR-2 and RET kinase inhibitor for the treatment of thyroid cancer, clioblastoma multiforme and NSCLC", Idrugs, vol. 13, No. 2, pp. 112-121, Feb. 2010.

Willhauck, M. J., "Neue Therapieoptionen bei fortgeschrittenen Schilddrusenkarzinomen" Deutsche Medizinische Wochenschrift 2011, 136, 1165-1168.

NCT00704288, Study of XL184 in Adults with Glioblastoma Multiformel, view Apr. 7, 2010, ClinicalTrials.gov. https://clinicaltrials.gov/ct2/history/NCT00704288?A=10&B-10.

NCT00704730, Efficacy Study of XL184 in Adults with Medullary Thyroid Cancer, view May 28, 2010, ClinicalTrials.gov. https://clinicaltrials.gov/ct2/history/NCT00704730?A=57&B=57.

Mologni, L., "Development of RET Kinase Inhibitors for Targeted Cancer Therapy" Current Medicinal Chemistry 2011,18, 162-175.

Kurzrock, R., et al., "Activity of XL184 (Cabozantinib), an oral tyrosine kinase inhibitor, in patients with medullary thyroid cancer", Journal of Clinical Oncology, vol. 29, No. 19, pp. 2660-2666, Jul. 1, 2011. Retrieved from the Internet: URL:https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3646303/.

Arko, et al., "Experimental approaches for the treatment of malignant gliomas" Pharmacology & Therapeutics 2010, 128, 1-36.

Handbook of Pharmaceutical Excipients Pharmaceutical Press, 2006 pp. 137, 188, 211, 701, 737 and 738.

Commission Decision dated Feb. 6, 2009.

Michael Aulton e Kevin Taylor, Pharmaceutics: The Science of Dosage Form Design, 2nd Edition, pp. 1 to 679 (Publication Year: 2001).

Rowe, Raymond C., et al., Handbook of Pharmaceutical Excipients, 6th Edition, Pharmaceutical Press and American Pharmacists Association, ISBN 9781582121352 (USA) (Publication Year: 2009).

Ravi Salgia et al., "A phase 1 dose-escalation study of the safety and pharmacokinetics (PK) of XL184, a VEGFR and MET kinase inhibitor, administered orally to patients (pts) with advanced malignancies", Mol Cancer Ther (2007) 6 (11_Supplement): A152 (Publication Date: Nov. 1, 2007).

Berge et al., "Pharmaceutical salts," J Pharm. Sci., 66 (1): 1-19 (Jan. 1977).

Vippagunta, et al., "Crystalline solids", Advanced Drug Delivery Reviews, vol. 48, pp. 3-26, 2001.

Bighley, Lyle D., et al., Salt Forms of Drugs and Absorption, in 13 Encyclopedia of Pharmaceutical Technology 453 (James Swarbrick & James C. Boylan eds., 1995).

Herbert A. Lieberman et al., Pharmaceutical Dosage Forms: Tablets, vol. 1 (2d. Ed., 1989) (PTX-553) Chap. 2-3.

**US 12,128,039 B2**

Page 3

(56)        **References Cited**

OTHER PUBLICATIONS

Esa Landenpaa et al., Crushing Strength, Disintegration Time and Weight Variation of Tablets Compressed from Three Avicel® PH Grades and Their Mixtures, 43 Euro. J. Pharmaceutics and Biopharmaceutics 315 (1997) (DTX-355).

Mira Jivraj et al., An Overview of the Different Excipients Useful for the Direct Compression of Tablets, 3 PSTT 58 (2000) (DTX-344).

Tong et al., In situ Salt Screening—A Useful Technique for Discovery Support and Preformulation Studies, Phann. Dev. Technol. 3 (2), 215-223 (1998) (DTX-243).

FDA, Guideline for Submitting Supporting Documentation in Drug Applications for the Manufacture of Drug Substances, Center for Drug Evaluation and Research (Feb. 1987) (DTX-170).

FDA Guidance for Industry, Genotoxic and Carcinogenic Impurities in Drug Substances and Products: Recommend Approaches (DTX-091).

Complaint for patent infringement—*Exelixis, Inc.* v. *MSN Laboratories Private Limited et al.*, 1_22-cv-00228, No. 1 (D.Del. Feb. 23, 2022).

Complaint for Patent Infringement—*Exelixis, Inc.* v. *MSN Laboratories Private Limited et al.*, 1_22-cv-00945, No. 1 (D.Del. Jul. 18, 2022).

Answer to 1 Complaint—*Exelixis, Inc.* v. *MSN Laboratories Private Limited et al.*, 1_22-cv-00228, No. 9 (D.Del. Feb. 25, 2022).

Answer to 9 Answer to Complaint—*Exelixis, Inc.* v. *MSN Laboratories Private Limited et al.*, 1_22-cv-00228, No. 15 (D.Del. Mar. 18, 2022).

Answer to Counterclaims—*Exelixis, Inc.* v. *MSN Laboratories Private Limited et al.*, 1_22-cv-00228, No. 41 (D.Del. Aug. 30, 2022).

Answer to 37 Amended Answer to Complaint—*Exelixis, Inc.* v. *MSN Laboratories Private Limited et al.*, 1_22-cv-00228, No. 46 (D.Del. Sep. 15, 2022).

Opening Post-Trial Brief on Invalidity—*Exelixis, Inc.* v. *MSN Laboratories Private Limited et al.*, 1_22-cv-00228, No. 169 (D.Del. Dec. 12, 2023).

Responsive Post-Trial Brief on Noninfringement—*Exelixis, Inc.* v. *MSN Laboratories Private Limited et al.*, 1_22-cv-00228, No. 173 (D.Del. Jan. 23, 2024).

Answer to 1 Complaint—*Exelixis, Inc.* v. *MSN Laboratories Private Limited et al.*, 1_22-cv-00945, No. 9 (D.Del. Aug. 9, 2022).

\* cited by examiner

US 12,128,039 B2

# PROCESSES FOR PREPARING QUINOLINE COMPOUNDS AND PHARMACEUTICAL COMPOSITIONS CONTAINING SUCH COMPOUNDS

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation application of U.S. Ser. No. 18/462,739, filed Sep. 7, 2023, which is a continuation application of U.S. Ser. No. 17/679,634, filed Feb. 24, 2022, which is a continuation application of U.S. Ser. No. 17/170, 275, filed Feb. 8, 2021, now U.S. Pat. No. 11,298,349, which is a continuation application of U.S. Ser. No. 17/152,394, filed Jan. 19, 2021, which is a continuation of U.S. application Ser. No. 16/706,323, filed Dec. 6, 2019, which is a division of U.S. application Ser. No. 16/151,653, filed Oct. 4, 2018, now U.S. Pat. No. 10,543,206, which is a division of U.S. application Ser. No. 15/348,716, filed Nov. 10, 2016, now U.S. Pat. No. 10,123,999, which is a division of U.S. application Ser. No. 13/984,559, filed Mar. 20, 2014, now U.S. Pat. No. 9,717,720, which claims priority under 35 U.S.C. § 371 to Patent Cooperation Treaty Application Number PCT/US2012/024591, filed Feb. 10, 2012, which claims the benefit of U.S. Provisional Application No. 61/441,520, filed Feb. 10, 2011, and U.S. Provisional Application No. 61/441,527, filed Feb. 10, 2011, the entire contents of which are incorporated herein by reference.

## FIELD OF THE INVENTION

This disclosure relates to processes for preparing compounds useful for modulating protein kinase enzymatic activity. More specifically, this disclosure relates to processes for preparing quinolines that are useful for modulating cellular activities such as proliferation, differentiation, programmed cell death, migration, and chemo-invasion and to pharmaceutical compositions containing such compounds.

## BACKGROUND OF THE INVENTION

Traditionally, dramatic improvements in the treatment of cancer are associated with identification of therapeutic agents acting through novel mechanisms. One mechanism that can be exploited in cancer treatment is the modulation of protein kinase activity because signal transduction through protein kinase activation is responsible for many of the characteristics of tumor cells. Protein kinase signal transduction is of particular relevance in, for example, renal, gastric, head and neck, lung, breast, prostate, and colorectal cancers; hepatocellular carcinoma; as well as in the growth and proliferation of brain tumor cells.

Protein kinases can be categorized as receptor type or non-receptor type. Receptor-type tyrosine kinases are comprised of a large number of transmembrane receptors with diverse biological activity. For a detailed discussion of the receptor-type tyrosine kinases, see Plowman et al., DN&P 7(6): 334-339, 1994. Since protein kinases and their ligands play critical roles in various cellular activities, deregulation of protein kinase enzymatic activity can lead to altered cellular properties, such as uncontrolled cell growth associated with cancer. In addition to oncological indications, altered kinase signaling is implicated in numerous other pathological diseases, including, for example, immunological disorders, cardiovascular diseases, inflammatory diseases, and degenerative diseases. Therefore, protein kinases are attractive targets for small molecule drug discovery. Particularly attractive targets for small-molecule modulation with respect to antiangiogenic and antiproliferative activity include receptor type tyrosine kinases c-Met, KDR, c-Kit, AxI, flt-3, and flt-4.

The kinase c-Met is the prototypic member of a subfamily of heterodimeric receptor tyrosine kinases (RTKs) which include Met, Ron, and Sea. The endogenous ligand for c-Met is the hepatocyte growth factor (HGF), a potent inducer of angiogenesis. Binding of HGF to c-Met induces activation of the receptor via autophosphorylation, resulting in an increase of receptor dependent signaling, which promotes cell growth and invasion. Anti-HGF antibodies or HGF antagonists have been shown to inhibit tumor metastasis in vivo (See: Maulik et al Cytokine & Growth Factor Reviews 2002 13, 41-59). c-Met overexpression has been demonstrated on a wide variety of tumor types including breast, colon, renal, lung, squamous cell myeloid leukemia, hemangiomas, melanomas, astrocytomas, and glioblastomas. Additionally, activating mutations in the kinase domain of c-Met have been identified in hereditary and sporadic renal papilloma and squamous cell carcinoma. (See, e.g., Maulik et al., Cytokine & growth Factor reviews 2002 13, 41-59; Longati et al., Curr Drug Targets 2001, 2, 41-55; Funakoshi et al., Clinica Chimica Acta 2003 1-23).

Inhibition of epidermal growth factor (EGF), vascular endothelial growth factor (VEGF), and ephrin signal transduction will prevent cell proliferation and angiogenesis, two key cellular processes needed for tumor growth and survival (Matter A., Drug Disc. Technol. 2001 6, 1005-1024). Kinase KDR (refers to kinase insert domain receptor tyrosine kinase) and flt-4 (fins-like tyrosine kinase-4) are both VEGF receptors. Inhibition of EGF, VEGF, and ephrin signal transduction will prevent cell proliferation and angiogenesis, two key cellular processes needed for tumor growth and survival (Matter A. Drug Disc. Technol. 2001 6, 1005-1024). EGF and VEGF receptors are desirable targets for small molecule inhibition. All members of the VEGF family stimulate cellular responses by binding to tyrosine kinase receptors (the VEGFRs) on the cell surface, causing them to dimerize and become activated through transphosphorylation. The VEGF receptors have an extracellular portion with immunoglobulin-like domains, a single transmembrane spanning region, and an intracellular portion containing a split tyrosine-kinase domain. VEGF binds to VEGFR-1 and VEGFR-2. VEGFR-2 is known to mediate almost all of the known cellular responses to VEGF.

Kinase c-Kit (also called stem cell factor receptor or steel factor receptor) is a type 3 receptor tyrosine kinase (RTK) belonging to the platelet-derived growth factor receptor subfamily. Overexpression of c-Kit and c-Kit ligand has been described in variety of human diseases, including human gastrointestinal stromal tumors, mastocytosis, germ cell tumors, acute myeloid leukemia (AML), NK lymphoma, small-cell lung cancer, neuroblastomas, gynecological tumors, and colon carcinoma. Moreover, elevated expression of c-Kit may also relate to the development of neoplasia associated with neurofibromatosis type 1 (NF-1), mesenchymal tumors GISTs, and mast cell disease, as well as other disorders associated with activated c-Kit.

Kinase Flt-3 (fins-like tyrosine kinase-3) is constitutively activated via mutation, either in the juxtamembrane region or in the activation loop of the kinase domain, in a large proportion of patients with AML (Reilly, Leuk. Lymphoma, 2003, 44: 1-7).

Small-molecule compounds that specifically inhibit, regulate, and/or modulate the signal transduction of kinases, such

US 12,128,039 B2

3

as c-Met, VEGFR2, KDR, c-Kit, Axl, flt-3, and flt-4 described above, are particularly desirable as a means to treat or prevent disease states associated with abnormal cell proliferation and angiogenesis. One such small-molecule is compound IA, which has the chemical structure:

IA

WO2005/030140 describes the synthesis of compound IA (Table 2, Compound 12, Example 48) and also discloses the therapeutic activity of this molecule to inhibit, regulate, and/or modulate the signal transduction of kinases (Assays, Table 4, entry 289), the entire contents of which is incorporated herein by reference.

Although therapeutic efficacy is the primary concern for a therapeutic agent, the pharmaceutical composition can be equally important to its development. Generally, the drug developer endeavors to discover a pharmaceutical composition that possesses desirable properties, such as satisfactory water-solubility (including rate of dissolution), storage stability, hygroscopicity, and reproducibility, all of which can impact the processability, manufacture, and/or bioavailability of the drug.

Accordingly, there is a need for the discovery of new processes for making quinolines such as compound IA that minimize the formation of undesirable process contaminants or byproducts. There is also a need for new pharmaceutical compositions containing quinolines such as compound IA that are essentially free of process byproducts.

## SUMMARY OF THE INVENTION

These and other needs are met by the present disclosure, which is directed to processes for making and compositions containing quinolines or pharmaceutically acceptable salts thereof.

In one aspect, the disclosure relates to processes for preparing a compound of formula I:

I

or a pharmaceutically acceptable salt thereof, wherein:
$X^1$ is H, Br, Cl, or F;
$X^2$ is H, Br, Cl, or F;
n1 is 1-2; and
n2 is 1-2.

4

Intermediates useful in preparing the above compounds are also disclosed.

The compounds of formula I are useful as protein kinase modulators, and they inhibit various protein kinases including Ret and c-Met.

In another aspect, the disclosure provides a process for preparing compound IB:

IB

from compound IA:

IA

comprising:

(a) heating and agitating a mixture comprising compound IA and L-malic acid, methylethyl ketone, and water;

(b) cooling the mixture;

(c) vacuum distilling the mixture successively; and

(d) isolating the compound of IB by filtration.

In another aspect, the disclosure provides a process for preparing compound IB:

IB

**5**

from compound IA:

comprising:

(a) heating and agitating a mixture comprising compound IA and L-malic acid, methylethyl ketone, and water;

(b) cooling the mixture;

(c) seeding the mixture with compound IB;

(d) vacuum distilling the mixture; and

(e) isolating compound IB by filtration.

In another aspect, the disclosure provides compound I, IA, or IB admixed with less than 100 ppm 6,7-dimethoxy-quinoline-4-ol, the structure of which is

In another aspect, the disclosure provides pharmaceutical compositions containing the compound of formula I, compound IA, or compound IB for oral administration.

In another aspect, the disclosure provides a pharmaceutical tablet composition according to Table 1.

TABLE 1

| Ingredient | % w/w |
|---|---|
| Compound I | 31.68 |
| Microcrystalline Cellulose (MCC) (Avicel PH102) | 38.85 |
| Lactose anhydrous 60M | 19.42 |
| Hydroxypropyl Cellulose, EXF | 3.00 |
| Croscarmellose Sodium | 3.00 |
| Total Intra-granular | 95.95 |
| Silicon dioxide, Colloidal PWD | 0.30 |
| Croscarmellose Sodium | 3.00 |
| Magnesium Stearate | 0.75 |
| Total | 100.00 |

In another aspect, the disclosure provides a pharmaceutical tablet composition according to Table 2.

TABLE 2

| Ingredient | (% w/w) |
|---|---|
| Compound I | 25.0-33.3 |
| Microcrystalline Cellulose, NF | q.s |
| Hydroxypropyl Cellulose, NF | 3 |
| Poloxamer, NF | 0-3 |

**6**

TABLE 2-continued

| Ingredient | (% w/w) |
|---|---|
| Croscarmellose Sodium, NF | 6.0 |
| Colloidal Silicon Dioxide, NF | 0.5 |
| Magnesium Stearate, NF | 0.5-1.0 |
| Total | 100 |

In another aspect, the disclosure provides a pharmaceutical tablet composition according to Table 2A.

TABLE 2A

| Ingredient | % w/w |
|---|---|
| Compound IB (10% drug load as Compound IA) | 12.67 |
| MCC | 51.52 |
| Lactose | 25.76 |
| Hydroxypropyl cellulose | 3.0 |
| Croscarmellose Sodium | 6.0 |
| Colloidal Silicon Dioxide | 0.3 |
| Magnesium Stearate | 0.75 |
| Total | 100 |

In another aspect, the disclosure provides a pharmaceutical capsule composition according to Table 3.

TABLE 3

| Ingredient | mg/unit dose |
|---|---|
| Compound IB (10% drug load as Compound IA) | 25 |
| Silicified Microcrystalline Cellulose | 196.75 |
| Croscarmellose sodium | 12.5 |
| Sodium starch glycolate | 12.5 |
| Fumed Silica | 0.75 |
| Stearic acid | 2.5 |
| Total Fill Weight | 250 |

In another aspect, the disclosure provides a pharmaceutical capsule composition according to Table 4.

TABLE 4

| Ingredient | mg/unit dose |
|---|---|
| Compound IB (50% drug load as Compound IA) | 100 |
| Silicified Microcrystalline Cellulose | 75.40 |
| Croscarmellose sodium | 10.00 |
| Sodium Starch Glycolate | 10.00 |
| Fumed silica | 0.6 |
| Stearic Acid | 4.0 |
| Total Fill Weight | 200 |

In another aspect, the disclosure provides a pharmaceutical capsule composition according to Table 5, wherein the IB weight equivalents are provided.

TABLE 5

| Ingredient | mg/unit dose 50 mg |
|---|---|
| Compound IB | 63.35 |
| Microcrystalline Cellulose | 95.39 |

US 12,128,039 B2

7

TABLE 5-continued

| Ingredient | mg/unit dose 50 mg |
|---|---|
| Croscarmellose sodium | 9.05 |
| Sodium starch glycolate | 9.05 |
| Fumed Silica | 0.54 |
| Stearic acid | 3.62 |
| Total Fill Weight | 181.00 |

In another aspect, the disclosure provides a pharmaceutical capsule composition according to Table 6, wherein the IB weight equivalents are provided.

TABLE 6

| Ingredient | mg/unit dose 60 mg |
|---|---|
| Compound IB | 73.95 |
| Microcrystalline Cellulose | 114.36 |
| Croscarmellose sodium | 10.85 |
| Sodium starch glycolate | 10.85 |
| Fumed Silica | 0.65 |
| Stearic acid | 4.34 |
| Total Fill Weight | 217.00 |

In another aspect, the invention is directed to a pharmaceutical composition comprising compound I, IA, or IB admixed with less than 100 ppm 6,7-dimethoxy-quinoline-4-ol, the structure of which is

and a pharmaceutically acceptable carrier.

There are many different aspects and embodiments of the disclosure described herein, and each aspect and each embodiment is non-limiting in regard to the scope of the disclosure. The terms "aspects" and "embodiments" are meant to be non-limiting regardless of where the terms "aspect" or "embodiment" appears in this specification. The transitional term "comprising," as used herein, which is synonymous with "including," "containing," or "characterized by," is inclusive or open-ended and does not exclude additional, unrecited elements.

DETAILED DESCRIPTION OF THE INVENTION

Definitions

As used herein, the following words and phrases are generally intended to have the meanings as set forth below, except to the extent that the context in which they are used indicates otherwise or they are expressly defined to mean something different.

The word "can" is used in a non-limiting sense and in contradistinction to the word "must." Thus, for example, in many aspects of the invention a certain element is described as "can" having a specified identity, which is meant to

8

convey that the subject element is permitted to have that identity according to the invention but is not required to have it.

If a group "R" is depicted as "floating" on a ring system, then unless otherwise defined, the substituent(s) "R" can reside on any atom of the ring system, assuming replacement of a depicted, implied, or expressly defined hydrogen from one of the ring atoms, so long as a stable structure is formed.

When there are more than one such depicted "floating" groups, such as where there are two groups; then, unless otherwise defined, the "floating" groups can reside on any atoms of the ring system, again assuming each replaces a depicted, implied, or expressly defined hydrogen on the ring.

"Pharmaceutically acceptable salts" include acid addition salts.

"Pharmaceutically acceptable acid addition salt" refers to those salts that retain the biological effectiveness of the free bases and that are not biologically or otherwise undesirable, formed with inorganic acids such as hydrochloric acid, hydrobromic acid, sulfuric acid, nitric acid, phosphoric acid, and the like, or mixtures thereof, as well as organic acids such as acetic acid, trifluoroacetic acid, propionic acid, glycolic acid, pyruvic acid, oxalic acid, maleic acid, malonic acid, succinic acid, fumaric acid, tartaric acid, citric acid, benzoic acid, cinnamic acid, mandelic acid, methanesulfonic acid, ethanesulfonic acid, p-toluenesulfonic acid, salicylic acid, and the like, or mixtures thereof.

"Essentially free" as used in the phrase "essentially free of process byproducts or contaminants," means that a compound or composition as disclosed here in is admixed with 200 parts per million (ppm) or less of such byproducts or contaminants.

The disclosure is further illustrated by the following examples, which are not to be construed as limiting the disclosure in scope or spirit to the specific procedures described in them. Unless specified otherwise, the starting materials and various intermediates may be obtained from commercial sources, prepared from commercially available organic compounds, or prepared using well-known synthetic processes.

Processes

Aspect 1: Processes for Making Compounds of Formula I

Aspect (1) of the invention relates to a process of preparing a compound of formula I:

or a pharmaceutically acceptable salt thereof, wherein:

$X^1$ is H, Br, Cl, or F;

$X^2$ is H, Br, Cl, or F;

n1 is 1-2; and

n2 is 1-2;

US 12,128,039 B2

**9**

the process comprising:

    contacting the compound of formula g(1) with reactant z(1) to yield the compound of formula I:

g(1)

I

The reaction is advantageously carried out under suitable reaction conditions. Non-limiting examples of suitable reaction conditions include using basic conditions. Non-limiting examples of basic conditions that can be used in Aspect (1) include the use of inorganic bases, such as aqueous KOH, NaOH, $K_2CO_3$, $Na_2CO_3$, $K_3PO_4$, $Na_3PO_4$, $K_2HPO_4$, $Na_2HPO_4$, and the like, or mixtures thereof. Other non-limiting examples of suitable reaction conditions include using suitable solvents. Non-limiting examples of suitable solvents that can be used include water miscible solvents, such as THF, acetone, ethanol, and the like, or mixtures thereof. Other non-limiting examples of suitable reaction conditions include using suitable temperatures. Suitable temperatures that may be used for the reaction include a temperature at a range from about 10° C. to about 30° C., or alternatively, at a range from about 15° C. to about 28° C., or alternatively, at a range from about 20° C. to about 25° C. The product formed by the reaction is in the free base form, and this free base form may be converted into a pharmaceutically acceptable salt thereof by processes known in the art. For example, the compound of formula I can be converted to the L-malate salt by the addition of L-malic acid and a suitable solvent.

Utilities of the compound of formula I are further described in WO 2005/030140 A2, which is incorporated herein by reference.

Embodiments of Aspect (1) Part A

In another embodiment of Aspect (1), $X^1$ is Cl or F.
In another embodiment of Aspect (1), $X^2$ is Cl or F.
In another embodiment of Aspect (1), $X^1$ is F.
In another embodiment of Aspect (1), $X^2$ is F.
In another embodiment of Aspect (1), $X^1$ is H.

**10**

In another embodiment of Aspect (1), $X^2$ is H.
In another embodiment of Aspect (1), n1 is 1.
In another embodiment of Aspect (1), n2 is 1.

In another embodiment of Aspect (1), n1 is 2.
In another embodiment of Aspect (1), n2 is 2.

All compounds of formula I for Aspect (1) disclosed above include any of the disclosed alternative embodiments in Part A for each of $X^1$, $X^2$, n1 or n2, in combination with any other of the disclosed alternative embodiments in Part A for each of $X^1$, $X^2$, n1, or n2, as well as a pharmaceutically acceptable salt of any such combination.

Embodiments of Aspect (1) Part B

In another embodiment of Aspect (1), n1 and n2 are each 1.
In another embodiment of Aspect (1), n1 and n2 are each 2.
In another embodiment of Aspect (1), n1 is 1; and n2 is 2.
In another embodiment of Aspect (1), n1 is 2 and n2 is 1.
In another embodiment of Aspect (1), $X^1$ is H; and $X^2$ is F.
In another embodiment of Aspect (1), $X^1$ is F; and $X^2$ is H.
In another embodiment of Aspect (1), $X^1$ and $X^2$ are each H.
In another embodiment of Aspect (1), $X^1$ and $X^2$ are each F.
In another embodiment of Aspect (1), $X^1$ is Cl; and $X^2$ is H.
In another embodiment of Aspect (1), $X^1$ is H; and $X^2$ is Cl.
In another embodiment of Aspect (1), $X^1$ and $X^2$ are each Cl.
In another embodiment of Aspect (1), $X^1$ is Cl; and $X^2$ is F.
In another embodiment of Aspect (1), $X^1$ is F; and $X^2$ is Cl.

US 12,128,039 B2

**11**

### Embodiments of Aspect (1) Part C

In an embodiment of Aspect (1), the compound of formula g(1) can be made by reacting a compound of formula f(1) with reactant y(1) to yield the compound of g(1):

f(1)

reactant y(1)

g(1)

wherein LG represents a leaving group, and each of $X^2$, and n2 are as defined in Aspect (1), or as in any of the embodiments of Aspect (1) Part A. A non-limiting example of a leaving group includes a halo group such as Cl, Br, or F. Various compounds of reactant y(1) are commercially available, such as 2-fluoro-4-aminophenol and 4-aminophenol. Also, the skilled artisan would be able to make any variation of reactant y(1) using commercially available starting materials and by using known techniques to modify these commercially available starting materials to yield various compounds within the scope of reactant y(1).

The reaction in this embodiment is advantageously carried out under suitable reaction conditions. Non-limiting examples of suitable reaction conditions include using suitable solvents such as polar solvents. Non-limiting examples of polar solvents that can be used include tetrahydrofuran (THF), dimethylacetamide (DMA), dimethylsulfoxide (DMSO), dimethylformamide (DMF), ethyl acetate, N-methyl pyrrolidone (NMP), propylene carbonate, and the like, or mixtures thereof. In another embodiment, the polar solvent is dimethylacetamide (DMA). In another embodiment, the polar solvent is dimethylsulfoxide (DMSO). In another embodiment, the polar solvent is dimethylformamide (DMF). In another embodiment, the polar solvent is ethyl acetate. In another embodiment, the polar solvent is N-methyl pyrrolidone (NMP). In another embodiment, the polar solvent is propylene carbonate. In another embodiment, the solvent is a mixture of solvents, such as a mixture comprising THF and DMA.

The reactants f(1) and y(1) can be added together at a temperature ranging from about 10° C. to about 30° C., or alternatively, from about 15° C. to about 28° C., or alternatively, from about 20° C. to about 25° C. The mixture is then heated to a temperature ranging from about 80° C. to about 125° C., or alternatively, from about 95° C. to about 110° C.,

**12**

or alternatively, from about 100° C. to about 105° C., and the selected temperature is maintained until the reaction is complete.

Other non-limiting examples of suitable reaction conditions in this step of Aspect (1) include the use of a suitable base, such as a metal hydroxide or a non-nucleophilic base. Examples of metal hydroxides include sodium hydroxide or potassium hydroxide. Non-limiting examples of non-nucleophilic bases that can be used include lithium diisopropylamide, lithium tetramethylpiperidide, and alkali metal alkoxides such as sodium tert-butoxide, potassium tert-butoxide, sodium-pentoxide, and the like, or mixtures thereof. Preferably, the base is sodium tert-butoxide or sodium tert-pentoxide. In one embodiment, the base is sodium tert-pentoxide. Typically the sodium tert-pentoxide is commercially available as 35 weight percent solution of base in tetrahydrofuran, or as a 95 weight percent solid reagent. Preferably, the sodium tert-pentoxide is a 95 weight percent solid.

Typically, approximately 1.1 to 3.0 molar equivalents of base are used relative the moles of f(1) that are used. More preferably, 1.3 to 2.5 molar equivalents of base are used relative the moles of f(1) that are used. More preferably, 1.5 to 2.2 molar equivalents of base are used relative the moles of f(1) that are used. More preferably, 1.7 to 2.1 molar equivalents of base are used relative the moles of f(1) that are used.

Typically, the amount of molar equivalents of amino phenol that are used exceeds the molar equivalents of base that are used. In one embodiment, 1.1 to 2 molar equivalents of amino phenol are used relative to the molar equivalents of base that are used.

Once the reaction is substantially complete, the reaction mixture can be cooled to a temperature ranging from about 10° C. to about 25° C. Precooled water can be charged at a rate to maintain a temperature that ranges from about 5° C. to about 35° C. Alternatively, the precooled water can be charged at a rate to maintain a temperature that ranges from about 10° C. to about 25° C. As a non-limiting example, the precooled water can be at a temperature ranging from about 0° C. to about 10° C. As another non-limiting example, the precooled water can be at a temperature ranging from about 2° C. to about 7° C. The precipitate can be collected by filtration under standard conditions and purified by standard purification techniques.

### Embodiments of Aspect (1) Part D

In an embodiment of Aspect (1), the compound of formula f(1) can be made by converting a compound of formula e(l) to the compound of formula f(l):

e(1)

f(1)

wherein LG represents a leaving group. Non-limiting examples of leaving groups that can be used include halo groups (e.g., Cl, Br, or F) that can be added by halogenating agents. Non-limiting examples of halogenating agents that

US 12,128,039 B2

**13**

can be used include chlorinating agents, such as $SOCl_2$, $SO_2Cl_2$, $COCl_2$, $PCl_5$, $POCl_3$, and the like.

The reaction is advantageously carried out under suitable reaction conditions. Non-limiting examples of suitable reaction conditions in Part D of Aspect (1) include the use of suitable solvents. Non-limiting example of suitable solvents that can be used during the halogenation of the compound of formula e(1) include a polar, aprotic solvent, such as $CH_3CN$, DMF, and the like, or mixtures thereof. In other embodiments, the chlorination can be carried out using $POCl_3$ in acetonitrile, $COCl_2$ in DMF, or $SOCl_2$ in DMF. The addition of the chlorination agent is advantageously carried out at a temperature ranging from about 60° C. to about 90° C. In another embodiment, the addition of the chlorination agent can be carried out at a temperature ranging from about 70° C. to about 85° C. In another embodiment, the addition of the chlorination agent can be carried out at a temperature ranging from about 74° C. to about 80° C. The product can then be collected by filtration and purified using standard techniques.

Embodiments of Aspect (1) Part E

In an embodiment of Aspect (1), reactant z(1) can be made by reacting reactant z(1a) with a chlorinating agent to yield reactant z(1):

reactant z(1a)

reactant z(1)

wherein $X^1$ is Br, Cl, or F; and n1 is 1-2. Compounds of reactant z(1a) can be made according to the process described in Example 25 of WO 2005/030140 A2, and the skilled artisan would be able to make any necessary substitutions using commercially available starting materials to come up with various compounds within the scope of reactant z(La). Example 25 in WO 2005/030140 A2 is incorporated herein by reference.

The reaction is advantageously carried out under suitable reaction conditions. Non-limiting examples of suitable reaction conditions include using a chlorinating agent such as $POCl_3$, oxalyl chloride, and the like. In another embodiment, oxalyl chloride is used as a chlorinating agent. Non-limiting examples of suitable reaction conditions include carrying out the reaction at a temperature in the range from about 0° C. to about 25° C., or alternatively at a temperature in the range from about 5° C. to about 20° C. Other non-limiting examples of suitable reaction conditions include carrying out the reaction in a suitable solvent. Non-limiting examples

**14**

of suitable solvents that can be used include polar aprotic solvents, such as halogenated hydrocarbons (e.g., dichloromethane and chloroform), ethers (e.g., $Et_2O$), dioxane, tetrahydrofuran (THF) containing catalytic DMF, and the like, or mixtures thereof. The resulting solution containing reactant z(1) can be used, without further processing, to make the compound of formula I.

Other Embodiments of Aspect (1)

In another embodiment of Aspect (1), the compound of formula I is a compound of formula IA-1:

IA-1

or a pharmaceutically acceptable salt thereof, wherein:
$X^1$ is H, Cl, Br, or F; and $X^2$ is H, Cl, Br, or F. Compound IA can be in the free base form or it can converted to a pharmaceutically acceptable salt thereof. Accordingly, compound IA can be converted to its L-malate salt by the addition of L-malic acid and a suitable solvent.

In another embodiment of Part D of Aspect (1), the compound of formula e(1) is compound e(2):

e(2)

and the compound of formula f(1) is compound f(2):

f(2)

In another embodiment of Part C of Aspect (1), the compound of formula f(1) is compound f(2):

f(2)

US 12,128,039 B2

## 15

reactant y(1) is reactant (y)(2):

reactant (y)(2)

wherein $X^2$ is hydrogen or fluoro; and

the compound of formula g(1) is of formula g(2):

g(2)

In a further embodiment, the reaction employs a non-nucleophilic base. In a further embodiment, the non-nucelophilic base is an alkali metal alkoxide; and the reaction is carried out in a polar solvent. In a further embodiment, the alkali metal alkoxide is sodium tert-butoxide, and the polar solvent is DMA.

In another embodiment of Part C of Aspect (1), the compound of formula f(1) is

f(2)

reactant y(1) is reactant (y)(3):

reactant (y)(3)

## 16

wherein $X^2$ is hydrogen or fluoro; and
the compound of formula g(1) is compound g(3):

g(3)

In another embodiment of Aspect (1) of this disclosure, the compound of formula g(1) is compound g(3):

g(3)

reactant z(1) is reactant (z)(2):

reactant z(2)

the compound of formula I is compound IA:

IA

In a further embodiment, the reaction is carried out in the presence of an inorganic base. In a further embodiment, the inorganic base is $K_2CO_3$, and the solvent employed in this reaction is a combination of THE and $H_2O$.

In another embodiment of Aspect (1) of this disclosure, $X^1$ and $X^2$ for each of formula g(1) and reactant z(1) are each

US 12,128,039 B2

**17**

selected from Cl or F. In another embodiment, $X^1$ and $X^2$ for each of formula g(2), and reactant z(1) are both F.

The compound of formula f(2), or a pharmaceutically acceptable salt thereof, can be made by converting the compound of formula e(2) to a compound of formula f(2) with a chlorinating agent in a suitable solvent:

e(2)

f(2)

The compound of formula f(2) can be in its free base form or converted to a pharmaceutically acceptable salt thereof. The reaction conditions that can be used in this aspect include any of the reaction conditions disclosed in Part E of Aspect (1).

Aspect 2: Processes for Making Compounds of Formula g(2)

Aspect (2) of the disclosure relates to a process of preparing compound g(2):

g(2)

or a pharmaceutically acceptable salt thereof; the process comprising reacting compound f(2) with reactant y(3) under basic conditions (e.g., using 2,6-lutidine) in an appropriate solvent to yield compound g(3):

f(2)    reactant y(3)

**18**

-continued

g(3)

The reaction conditions that can be used in this aspect include any of the reaction conditions disclosed in Part C of Aspect (1).

Alternative reaction conditions that can be used in this aspect include any of the reaction conditions disclosed in Parts C and D of Aspect (1).

Aspect 3: Processes for Making Compounds of IB

As indicated above, in one aspect, the invention provides a process for preparing compound IB:

IB

from compound IA:

IA

comprising:
   (a) heating and agitating a mixture comprising compound IA and L-malic acid, methylethyl ketone, and water;
   (b) cooling the mixture;
   (c) vacuum distilling the mixture successively; and
   (d) isolating the compound of IB by filtration.

In one embodiment of this aspect, compound IA is admixed with a sufficient amount of L-malic acid in a methylethyl ketone (MEK)/water (1:1) mixture. Alternatively, L-malic acid is added as a solution in water to a mixture of compound IA in methyl ethyl ketone. Generally

19

20

the amount of L-malic is greater than 1 molar equivalent relative to compound IA. The mixture of compound IA and L-malic acid in MEK/water is heated at about 40-70° C., and preferably at about 50-60° C., and more preferably at about 55-60° C. with agitation, such as by stirring or the like, for about 1 to about 5 hours. At the end of the heating, the mixture is optionally clarified by filtering to give a clear solution. The resulting clear solution is then vacuum distilled from 1 to about 5 times at 150 to 200 mm Hg and a maximum jacket temperature of 55° C. to provide the desired crystalline compound of IB.

In one embodiment, L-malic acid is charged as a solution in water to compound IA. Generally the amount of L-malic is greater than 1 molar equivalent relative to compound IA. The mixture of compound IA and L-malic acid in MEK/water is heated at about 40-70° C., and preferably at about 50-60° C., and more preferably at about 55-60° C. with agitation, such as by stirring or the like, for about 1 to about 5 hours. At the end of the heating, the mixture is optionally clarified by filtering to give a clear solution which is at a temperature of about 30-40° C., and more preferably at a temperature of about 33-37° C. This clear solution is optionally seeded to facilitate crystallization. After seeding, the resulting mixture is vacuum distilled as provided above.

In one embodiment, compound IB is in the N-1 form. In another embodiment, compound IB is in the N-2 form. In another embodiment, compound IB is a mixture of the N-1 form and the N-2 form. Processes for preparing the N-1 and N-2 forms of compound IB are disclosed in WO 2010/083414 (PCT/US2010021194), the entire contents of which are incorporated herein by reference.

In another embodiment, the disclosure relates to compound IA or IB admixed with 100 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In one embodiment, the compound is admixed with 50 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In another embodiment, the compound is admixed with 25 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In another embodiment, the compound is admixed with 10 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In another embodiment, the compound is admixed with 5 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In another embodiment, the compound is admixed with 2.5 ppm or less of 6,7-dimethoxy-quinoline-4-ol.

In another embodiment, the disclosure relates to compound IA admixed with 100 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In one embodiment, the compound is admixed with 50 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In another embodiment, the compound is admixed with 25 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In another embodiment, the compound is admixed with 10 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In another embodiment, the compound is admixed with 5 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In another embodiment, the compound is admixed with 2.5 ppm or less of 6,7-dimethoxy-quinoline-4-ol.

In another embodiment, the disclosure relates to compound IB admixed with 100 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In one embodiment, the compound is admixed with 50 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In another embodiment, the compound is admixed with 25 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In another embodiment, the compound is admixed with 10 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In another embodiment, the compound is admixed with 5 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In another embodiment, the compound is admixed with 2.5 ppm or less of 6,7-dimethoxy-quinoline-4-ol.

In another embodiment, the disclosure relates to compound IB in the N-1 form admixed with 100 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In one embodiment, the compound is admixed with 50 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In another embodiment, the compound is admixed with 25 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In another embodiment, the compound is admixed with 10 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In another embodiment, the compound is admixed with 5 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In another embodiment, the compound is admixed with 2.5 ppm or less of 6,7-dimethoxy-quinoline-4-ol.

In another embodiment, the disclosure relates to compound IB in the N-2 form admixed with 100 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In one embodiment, the compound is admixed with 50 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In another embodiment, the compound is admixed with 25 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In another embodiment, the compound is admixed with 10 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In another embodiment, the compound is admixed with 5 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In another embodiment, the compound is admixed with 2.5 ppm or less of 6,7-dimethoxy-quinoline-4-ol.

In another embodiment, the disclosure relates to compound IB as a mixture of the N-1 form and the N-2 form admixed with 100 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In one embodiment, the compound is admixed with 50 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In another embodiment, the compound is admixed with 25 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In another embodiment, the compound is admixed with 10 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In another embodiment, the compound is admixed with 5 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In another embodiment, the compound is admixed with 2.5 ppm or less of 6,7-dimethoxy-quinoline-4-ol.

Pharmaceutical Compositions

In another embodiment, the disclosure relates to a pharmaceutical composition comprising Compound I, IA, or IB. Various carriers used in formulating pharmaceutically acceptable compositions and known techniques for their bulk preparation and subsequent production into unit dosage forms are employed to make the pharmaceutical compositions disclosed herein and are described in Remington: The Science and Practice of Pharmacy, 21st edition, 2005, ed. D. B. Troy, Lippincott Williams & Wilkins, Philadelphia, and Encyclopedia of Pharmaceutical Technology, eds. J. Swarbrick and J. C. Boylan, 1988-1999, Marcel Dekker, New York. The amount of carriers and excipients used in a composition can be varied proportionally according to the amount of active ingredient used (that is, Compound I, IA or IB).

In one embodiment, the pharmaceutical composition is a tablet.

In another embodiment, the pharmaceutical composition is a capsule.

In another embodiment, the pharmaceutical composition comprises Compound IA.

In another embodiment, the pharmaceutical composition comprises Compound IB.

In another embodiment, the pharmaceutical composition comprises Compound IB. as the N-1 polymorph.

In another embodiment, the pharmaceutical composition comprises Compound IB as the N-2 polymorph.

US 12,128,039 B2

21

In another embodiment, the pharmaceutical composition comprises Compound IB as a mixture of the N-1 form and the N-2 form.

In another embodiment, the disclosure relates to a pharmaceutical composition comprising Compound IA or IB; one or more fillers; one or more disintegrants; one or more glidants; and one or more lubricants.

In this embodiment, the filler comprises microcrystalline cellulose.

In this embodiment, the disintegrant comprises croscarmellose sodium.

In this embodiment, the disintegrant comprises croscarmellose sodium and sodium starch glycolate.

In this embodiment, the glidant comprises fumed silica.

In this embodiment, the lubricant comprises stearic acid.

In another embodiment, the disclosure relates to a pharmaceutical composition comprising Compound IA or IB; microcrystalline cellulose; lactose; hydroxypropyl cellulose; croscarmellose sodium; colloidal silicon dioxide; and magnesium stearate.

In another embodiment, the disclosure relates to a pharmaceutical composition comprising Compound IA or IB; microcrystalline cellulose; hydroxypropyl cellulose; a surfactant; croscarmellose sodium; colloidal silicon dioxide; and magnesium stearate.

In another embodiment, the disclosure relates to a pharmaceutical composition comprising Compound IA or IB; microcrystalline cellulose; croscarmellose sodium; fumed silica; and stearic acid.

In another embodiment, the disclosure relates to a pharmaceutical composition comprising Compound IA or IB; microcrystalline cellulose; anhydrous lactose; hydroxypropyl cellulose; croscarmellose sodium; silicon dioxide; and magnesium stearate.

In another embodiment, the disclosure relates to a pharmaceutical composition comprising Compound IA or IB; microcrystalline cellulose; anhydrous lactose; hydroxypropyl cellulose; a surfactant; croscarmellose sodium; silicon dioxide; and magnesium stearate.

In another aspect, the disclosure provides a pharmaceutical composition according to Tables 1, 2, 2A, 3, 4, 5, and 6 as provided above. The compositions are prepared according to methods available to the skilled artisan. For example, the Tablet formulations are prepared by combining, blending, and compacting the components of the tablet compositions. The capsule compositions are prepared by combining and blending the components and then placing the blend in a gelatin capsule.

For example, the 25 mg capsules (Table 3, 10 percent drug load formulation) are prepared as follows. The drug substance is delumped through a mill. The delumped drug substance is then co-screened with an equal volume Prosolv HD90. The excipients, except for stearic acid, are screened and charged to a blender along with the co-screened drug substance. The mixture is blended in a V-Blender. This process is repeated to manufacture a second sublot of unlubricated blend. The two sublots are then combined together in a V-blender and lubricated with stearic acid which has been co-screened with an equal volume of unlubricated blend. The final blend is then encapsulated into opaque, size 1 gelatin capsules using an automated capsule filling machine. The capsules are then weight sorted through an automatic weight sorter.

The 100-mg capsules (Table 4, 50% drug load formulation) are manufactured in two equal sublots of 5 kg of blend which are combined prior to lubricant blend The drug substance is delumped through a mill. The excipients, except

22

for stearic acid, are screened and charged to the mixer along with the delumped drug substance. The mixture is blended with a high shear mixer. The process is repeated to manufacture a second sublot of unlubricated blend. The final blend is then encapsulated into Swedish oraopaque, size 1 gelatin capsules using an automated capsule filling machine. The capsuare then weight sorted through an automatic weight sorter.

The 50 and 60 mg capsules (Tables 5 and 6) are prepared in a similar fashion as the 25 and 100 mg capsules.

In another aspect, the disclosure relates to a pharmaceutical composition comprising a compound of Formula IA or IB and a pharmaceutically acceptable carrier admixed with less than 100 ppm of 6,7-dimethoxy-quinoline-4-ol. 6,7-dimethoxy-quinoline-4-ol, the structure of which is

can be used as reagent e(1) to make chloride f(1) and is a byproduct that may form during the synthesis of Compound IA or IB. Minimizing the concentration of contaminants or byproducts such as 6,7-dimethoxy-quinoline-4-ol in pharmaceutical compositions destined for human administration is desirable.

In one embodiment, the pharmaceutical composition as defined in any of the previous embodiments (for example, the pharmaceutical composition of Tables 1, 2, 2A, 3, 4, 5, and 6) is admixed with 100 ppm 6,7-dimethoxy-quinoline-4-ol.

In another embodiment, the pharmaceutical composition as defined in any of the previous embodiments is admixed with 50 ppm 6,7-dimethoxy-quinoline-4-ol.

In another embodiment, the pharmaceutical composition as defined in any of the previous embodiments is admixed with 25 ppm 6,7-dimethoxy-quinoline-4-ol.

In another embodiment, the pharmaceutical composition as defined in any of the previous embodiments is admixed with 15 ppm 6,7-dimethoxy-quinoline-4-ol.

In another embodiment, the pharmaceutical composition as defined in any of the previous embodiments is admixed with 10 ppm 6,7-dimethoxy-quinoline-4-ol.

In another embodiment, the pharmaceutical composition as defined in any of the previous embodiments is admixed with 5 ppm 6,7-dimethoxy-quinoline-4-ol.

In another embodiment, the pharmaceutical composition as defined in any of the previous embodiments is admixed with 2.5 ppm 6,7-dimethoxy-quinoline-4-ol.

In another embodiment, the disclosure relates to a pharmaceutical composition comprising Compound IA or IB; one or more fillers; one or more disintegrants; one or more glidants; and one or more lubricants admixed with 100 ppm or less 6,7-dimethoxy-quinoline-4-ol.

In this embodiment, the filler comprises microcrystalline cellulose.

In this embodiment, the disintegrant comprises croscarmellose sodium.

In this embodiment, the disintegrant comprises croscarmellose sodium and sodium starch glycolate.

In this embodiment, the glidant comprises fumed silica.

In this embodiment, the lubricant comprises stearic acid.

US 12,128,039 B2

23

In another embodiment, the disclosure relates to a pharmaceutical composition comprising Compound IA or IB; microcrystalline cellulose; croscarmellose sodium; fumed silica; and stearic acid; admixed with 100 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In one embodiment of this embodiment, the composition is admixed with 50 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In another embodiment of this embodiment, the composition is admixed with 25 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In another embodiment of this embodiment, the composition is admixed with 10 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In another embodiment of this embodiment, the composition is admixed with 5 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In another embodiment of this embodiment, the composition is admixed with 2.5 ppm or less of 6,7-dimethoxy-quinoline-4-ol.

In another embodiment, the disclosure relates to a pharmaceutical composition comprising Compound IA or IB; microcrystalline cellulose; anhydrous lactose; hydroxypropyl cellulose; a surfactant; croscarmellose sodium; silicon dioxide; and magnesium stearate; admixed with 100 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In one embodiment of this embodiment, the composition is admixed with 50 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In another embodiment of this embodiment, the composition is admixed with 25 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In another embodiment of this embodiment, the composition is admixed with 10 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In another embodiment of this embodiment, the composition is admixed with 5 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In another embodiment of this embodiment, the composition is admixed with 2.5 ppm or less of 6,7-dimethoxy-quinoline-4-ol.

In another embodiment, the disclosure relates to a pharmaceutical composition comprising Compound IA or IB; microcrystalline cellulose; croscarmellose sodium; fumed silica; and stearic acid; admixed with 100 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In one embodiment of this

24

embodiment, the composition is admixed with 50 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In another embodiment of this embodiment, the composition is admixed with 25 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In another embodiment of this embodiment, the composition is admixed with 10 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In another embodiment of this embodiment, the composition is admixed with 5 ppm or less of 6,7-dimethoxy-quinoline-4-ol. In another embodiment of this embodiment, the composition is admixed with 2.5 ppm or less of 6,7-dimethoxy-quinoline-4-ol.

EXAMPLES

The invention is illustrated further by the following examples in Scheme 1 and the description thereof, which are not to be construed as limiting the invention in scope or spirit to the specific procedures described in them. Those having skill in the art will recognize that the starting materials may be varied and additional steps employed to produce compounds encompassed by the invention, as demonstrated by the following examples. Those skilled in the art will also recognize that it may be necessary to utilize different solvents or reagents to achieve some of the above transformations. Unless otherwise specified, all reagents and solvents are of standard commercial grade and are used without further purification. The appropriate atmosphere to run the reaction under, for example, air, nitrogen, hydrogen, argon, and the like, will be apparent to those skilled in the art.

Preparation of N-(4-{[6,7-bis(methyloxy)quinolin-4-yl]oxy}phenyl)-N'-(4-fluorophenyl)cyclopropane-1,1-dicarboxamide and the (L)-malate salt thereof

A synthetic route that can be used for the preparation of N-(4-{[6,7-bis(methyloxy)quinolin-4-yl]oxy}phenyl)-N'-(4-fluorophenyl)cyclopropane-1,1-dicarboxamide and the (L)-malate salt thereof is depicted in FIG. 1:

Figure 1

US 12,128,039 B2

25            26

-continued

(L)-Malic
acid
MEK

•$C_4H_6O_5$

### Preparation of 4-Chloro-6,7-dimethoxy-quinoline

A reactor was charged sequentially with 6,7-dimethoxy-quinoline-4-ol (47.0 kg) and acetonitrile (318.8 kg). The resulting mixture was heated to approximately 60° C., and phosphorus oxychloride ($POCl_3$, 130.6 kg) was added. After the addition of $POCl_3$, the temperature of the reaction mixture was raised to approximately 77° C. The reaction was deemed complete (approximately 13 hours) when less than 3% of the starting material remained (in-process high-performance liquid chromatography [HPLC] analysis). The reaction mixture was cooled to approximately 2-7° C. and then quenched into a chilled solution of dichloromethane (DCM, 482.8 kg), 26% $NH_4OH$ (251.3 kg), and water (900 L). The resulting mixture was warmed to approximately 20-25° C., and phases were separated. The organic phase was filtered through a bed of AW hyflo super-eel NF (Celite; 5.4 kg) and the filter bed was washed with DCM (118.9 kg). The combined organic phase was washed with brine (282.9 kg) and mixed with water (120 L). The phases were separated and the organic phase was concentrated by vacuum distillation with the removal of solvent (approximately 95 L residual volume). DCM (686.5 kg) was charged to the reactor containing organic phase and concentrated by vacuum distillation with the removal of solvent (approximately 90 L residual volume). Methyl t-butyl ether (MTBE, 226.0 kg) was then charged and the temperature of the mixture was adjusted to −20 to −25° C. and held for 2.5 hours resulting in solid precipitate which was then filtered and washed with n-heptane (92.0 kg), and dried on a filter at approximately 25° C. under nitrogen to afford the title compound. (35.6 kg).

### Preparation of 4-(6,7-dimethoxy-quinoline-4-yloxy)-phenylamine

4-Aminophenol (24.4 kg) dissolved in N,N-dimethylacetamide (DMA, 184.3 kg) was charged to a reactor containing 4-chloro-6,7-dimethoxyquinoline (35.3 kg), sodium t-butoxide (21.4 kg) and DMA (167.2 kg) at 20-25° C. This mixture was then heated to 100-105° C. for approximately 13 hours. After the reaction was deemed complete as determined using in-process HPLC analysis (<2% starting material remaining), the reactor contents were cooled at 15 to 20° C. and water (pre-cooled, 2 to 7° C., 587 L) charged at a rate to maintain 15 to 30° C. temperature. The resulting solid precipitate was filtered, washed with a mixture of water (47 L) and DMA (89.1 kg) and finally with water (214 L). The filter cake was then dried at approximately 25° C. on filter to yield crude 4-(6,7-dimethoxy-quinoline-4-yloxy)-phenylamine (59.4 kg wet, 41.6 kg dry calculated based on LOD). Crude 4-(6,7-dimethoxy-quinoline-4-yloxy)-phenylamine was refluxed (approximately 75° C.) in a mixture of tetrahydrofuran (THF, 211.4 kg) and DMA (108.8 kg) for approximately 1 hour and then cooled to 0-5° C. and aged for approximately 1 h after which time the solid was filtered, washed with THF (147.6 kg) and dried on a filter under vacuum at approximately 25° C. to yield 4-(6,7-dimethoxy-quinoline-4-yloxy)-phenylamine (34.0 kg).

### Alternative Preparation of 4-(6,7-dimethoxy-quinoline-4-yloxy)-phenylamine

4-chloro-6,7-dimethoxyquinoline (34.8 kg) and 4-aminophenol (30.8 kg) and sodium tert pentoxide (1.8 equivalents) 88.7 kg, 35 wt percent in THF) were charged to a reactor, followed by N,N-dimethylacetamide (DMA, 293.3 kg). This mixture was then heated to 105-115° C. for approximately 9 hours. After the reaction was deemed complete as determined using in-process HPLC analysis (<2% starting material remaining), the reactor contents were cooled at 15 to 25° C. and water (315 kg) was added over a two hour period while maintaining the temperature between 20 and 30° C. The reaction mixture was then agitated for an additional hour at 20 to 5° C. The crude product was collected by filtration and washed with a mixture of 88 kg water and 82.1 kg DMA, followed by 175 kg water. The product was dried on a filter drier for 53 hours. The LOD showed less than 1% w/w.

US 12,128,039 B2

27

In an alternative procedure, 1.6 equivalents of sodium tert-pentoxide were used and the reaction temperature was increased from 110-120° C. In addition, the cool down temperature was increased to 35-40° C. and the starting temperature of the water addition was adjusted to 3540° C., with an allowed exotherm to 45° C.

Preparation of 1-(4-fluoro-phenylcarbamoyl)-cyclo-propanecarboxylic acid

Triethylamine (19.5 kg) was added to a cooled (approximately 5 C) solution of cyclopropane-1,1-dicarboxylic acid (24.7 kg) in THF (89.6 kg) at a rate such that the batch temperature did not exceed 5° C. The solution was stirred for approximately 1.3 hours, and then thionyl chloride (23.1 kg) was added, keeping the batch temperature below 10° C. When the addition was complete, the solution was stirred for approximately 4 h keeping temperature below 10° C. A solution of 4-fluoroaniline (18.0 kg) in THE (33.1 kg) was then added at a rate such that the batch temperature did not exceed 10° C. The mixture was stirred for approximately 10 hours after which the reaction was deemed complete. The reaction mixture was then diluted with isopropyl acetate (218.1 kg). This solution was washed sequentially with aqueous sodium hydroxide (10.4 kg, 50% dissolved in 119 L of water) further diluted with water (415 L), then with water (100 L) and finally with aqueous sodium chloride (20.0 kg dissolved in 100 L of water). The organic solution was concentrated by vacuum distillation (100 L residual volume) below 40° C. followed by the addition of n-heptane (171.4 kg), which resulted in the precipitation of solid. The solid was recovered by filtration and washed with n-Heptane (102.4 kg) resulting in wet crude, 1-(4-fluoro-phenylcar-bamoyl)-cyclopropanecarboxylic acid (29.0 kg). The crude, 1-(4-fluoro-phenylcarbamoyl)-cyclopropanecarboxylic acid was dissolved in methanol (139.7 kg) at approximately 25° C. followed by the addition of water (320 L) resulting in slurry which was recovered by filtration, washed sequentially with water (20 L) and n-heptane (103.1 kg) and then dried on the filter at approximately 25° C. under nitrogen to afford the title compound (25.4 kg).

Preparation of 1-(4-Fluoro-phenylcarbamoyl)-cyclopropanecarbonyl chloride

Oxalyl chloride (12.6 kg) was added to a solution of 1-(4-fluoro-phenylcarbamoyl)-cyclopropanecarboxylic acid (22.8 kg) in a mixture of THE (96.1 kg) and N, N-dimethylformamide (DMF; 0.23 kg) at a rate such that the batch temperature did not exceed 25° C. This solution was used in the next step without further processing.

Alternative Preparation of 1-(4-Fluoro-phenylcarbamoyl)-cyclopropanecarbonyl chloride

A reactor was charged with 1-(4-fluoro-phenylcarbamoyl)-cyclopropanecarboxylic acid (35 kg), 344 g DMF, and 175 kg THE. The reaction mixture was adjusted to 12-17° C. and then to the reaction mixture was charged 19.9 kg of oxalyl chloride over a period of 1 hour. The reaction mixture

28

was left stirring at 12-17° C. for 3 to 8 hours. This solution was used in the next step without further processing.

Preparation of cyclopropane-1,1-dicarboxylic acid [4-(6,7-dimethoxy-quinoline-4-yloxy)-phenyl]-amide (4-fluoro-phenyl)-amide (Compound IA)

The solution from the previous step containing 1-(4-fluoro-phenylcarbamoyl)-cyclopropanecarbonyl chloride was added to a mixture of compound 4-(6,7-dimethoxy-quinoline-4-yloxy)-phenylamine (23.5 kg) and potassium carbonate (31.9 kg) in THE (245.7 kg) and water (116 L) at a rate such that the batch temperature did not exceed 30° C. When the reaction was complete (in approximately 20 minutes), water (653 L) was added. The mixture was stirred at 20-25° C. for approximately 10 hours, which resulted in the precipitation of the product. The product was recovered by filtration, washed with a pre-made solution of THE (68.6 kg) and water (256 L), and dried first on a filter under nitrogen at approximately 25° C. and then at approximately 45° C. under vacuum to afford the title compound (41.0 kg, 38.1 kg, calculated based on LOD).

Alternative Preparation of cyclopropane-1,1-dicar-boxylic acid [4-(6,7-dimethoxy-quinoline-4-yloxy)-phenyl]-amide (4-fluoro-phenyl)-amide

A reactor was charged with 4-(6,7-dimethoxy-quinoline-4-yloxy)-phenylamine (35.7 kg, 1 equivalent), followed by 412.9 kg THF. To the reaction mixture was charged a solution of 48.3 K$_2$CO$_3$ in 169 kg water. The acid chloride solution of described in the Alternative Preparation of 1-(4-Fluoro-phenylcarbamoyl)-cyclopropanecarbonyl chloride above was transferred to the reactor containing 4-(6,7-dimethoxy-quinoline-4-yloxy)-phenylamine while maintaining the temperature between 20-30° C. over a minimum of two hours. The reaction mixture was stirred at 20-25° C. for a minimum of three hours. The reaction temperature was then adjusted to 30-25° C. and the mixture was agitated. The agitation was stopped and the phases of the mixture were allowed to separate. The lower aqueous phase was removed and discarded. To the remaining upper organic phase was added 804 kg water. The reaction was left stirring at 15-25° C. for a minimum of 16 hours.

The product precipitated. The product was filtered and washed with a mixture of 179 kg water and 157.9 THF in two portions. The crude product was dried under a vacuum for at least two hours. The dried product was then taken up in 285.1 kg THF. The resulting suspension was transferred to reaction vessel and agitated until the suspension became a clear (dissolved) solution, which required heating to 30-35° C. for approximately 30 minutes. 456 kg water was then added to the solution, as well as 20 kg SDAG-1 ethanol (ethanol denatured with methanol over two hours. The mixture was agitated at 15-25° C. for at least 16 hours. The product was filtered and washed with a mixture of 143 kg water and 126.7 THF in two portions. The product was dried at a maximum temperature set point of 40° C.

In an alternative procedure, the reaction temperature during acid chloride formation was adjusted to 10-15° C. The recrystallization temperature was changed from 15-25° C. to 45-50° C. for 1 hour and then cooled to 15-25° C. over 2 hours.

Preparation of cyclopropane-1,1-dicarboxylic acid [4-(6,7-dimethoxy-quinoline-4-yloxy)-phenyl]-amide (4-fluoro-phenyl)-amide, (L) malate salt (Compound IB)

Cyclopropane-1,1-dicarboxylic acid [4-(6,7-dimethoxy-quinoline-4-yloxy)-phenyl]-amide (4-fluoro-phenyl)-amide

US 12,128,039 B2

29                                                          30

(1-5; 13.3 kg), L-malic acid (4.96 kg), methyl ethyl ketone (MLEK; 188.6 kg) and water (37.3 kg) were charged to a reactor and the mixture was heated to reflux (approximately 74° C.) for approximately 2 hours. The reactor temperature was reduced to 50 to 55° C. and the reactor contents were filtered. These sequential steps described above were repeated two more times starting with similar amounts of 1-5 (13.3 kg), L-Malic acid (4.96 kg), MEK (198.6 kg) and water (37.2 kg). The combined filtrate was azeotropically dried at atmospheric pressure using MEK (1133.2 kg) (approximate residual volume 711 L; KF≤0.5% w/w) at approximately 74° C. The temperature of the reactor contents was reduced to 20 to 25° C. and held for approximately 4 hours resulting in solid precipitate which was filtered, washed with MEK (448 kg) and dried under vacuum at 50° C. to afford the title compound (45.5 kg).

Alternative Preparation of cyclopropane-1,1-dicarboxylic acid [4-(6,7-dimethoxy-quinoline-4-yloxy)-phenyl]-amide (4-fluoro-phenyl)-amide, (L) malate salt

Cyclopropane-1,1-dicarboxylic acid [4-(6,7-dimethoxy-quinoline-4-yloxy)-phenyl]-amide (4-fluoro-phenyl)-amide (47.9 kg), L-malic acid (17.2), 658.2 kg methyl ethyl ketone, and 129.1 kg water (37.3 kg) were charged to a reactor and the mixture was heated 50-55° C. for approximately 1-3 hours, and then at 55-60° C. for an addition al 4-5 hours. The mixture was clarified by filtration through a 1 μm cartridge. The reactor temperature was adjusted to 20-25° C. and vacuum distilled with a vacuum at 150-200 mm Hg with a maximum jacket temperature of 55° C. to the volume range of 558-731 L.

The vacuum distillation was performed two more times with the charge of 380 kg and 380.2 kg methyl ethyl ketone, respectively. After the third distillation, the volume of the batch was adjusted to 18 v/w of Cyclopropane-1,1-dicarboxylic acid [4-(6,7-dimethoxy-quinoline-4-yloxy)-phenyl]-amide (4-fluoro-phenyl)-amide by charging 159.9 kg methyl ethyl ketone to give a total volume of 880 L. An addition al vacuum distillation was carried out by adjusting 245.7 methyl ethyl ketone. The reaction mixture was left with moderate agitation at 20-25° C. for at least 24 hours. The product was filtered and washed with 415.1 kg methyl ethyl ketone in three portions. The product was dried under a vacuum with the jacket temperature set point at 45° C.

In an alternative procedure, the order of addition was changed so that a solution of 17.7 kg L-malic acid dissolved in 129.9 kg water was added to Cyclopropane-1,1-dicarboxylic acid [4-(6,7-dimethoxy-quinoline-4-yloxy)-phenyl]-amide (4-fluoro-phenyl)-amide (48.7 kg) in methyl ethyl ketone (673.3 kg).

Preparation of Compound IB, Form N-1

A solution was prepared by adding tetrahydrofuran (12 mL/g-bulk-LR (limiting reagent); 1.20 L) and N-(4-{[6,7-bis(methyloxy)-quinolin-4-yl]oxy}phenyl)-N'-(4-fluoro-phenyl)cyclopropane-1,1-dicarboxamide, (100 g; 1.00 equiv; 100.00 g) and (L)-malic acid (1.2 equiv (molar); 32.08 g) to a 1 L reactor. Water (0.5317 mL/g-bulk-LR; 53.17 mL) was added and the solution was heated to 60° C. and maintained at that temperature for one hour until the solids were fully dissolved. The solution was passed through a Polish Filter.

At 60° C., acetonitrile (12 mL/g-bulk-LR; 1.20 L) was added over a period of 8 hours. The solution was held at 60°

C. for 10 hours. The solution was then cooled to 20° C. and held for 1 hour. The solids were filtered and washed with acetonitrile (12 mL/g-bulk-LR; 1.20 L). The solids were dried at 60° C. (25 mm Hg) for 6 hours to afford compound (I), Form N-1 (108 g; 0.85 equivalent; 108.00 g; 85.22% yield) as a white crystalline solid.

Alternate Preparation of Compound IB, Form N-1

A solution was prepared with 190 mL tetrahydrofuran (110 mL), methyl isobutyl ketone, and 29 mL water. Next, 20 mL of this solution were transferred into an amber bottle, and then saturated by adding N-(4-{[6,7-bis(methyloxy)-quinolin-4-yl]oxy}phenyl)-N'-(4-fluorophenyl)cyclopropane-1,1-dicarboxamide, (L)-malate until a thick slurry formed, and aging for at least 2 hours with stirring at room temperature. The solids were removed by filtration through a Buchner funnel, rendering a clear saturated solution.

Separately, a powder blend was made with known amounts of two batches of compound IB: (1) 300 mg of batch 1, which contained approximately 41% compound IB, Form N-1 and 59% compound IB, Form N-2 by Raman spectroscopy analysis, and (2) 200 mg of batch 2, which had a XPRD pattern similar to compound IB, Form N-2.

The compound IB, Form N-1 and compound (I), Form N-2 powder blend was added into the saturated solution, and the slurry was aged under magnetic stirring at room temperature for 25 days. The slurry was then sampled and filtered through a Buchner funnel to obtain 162 mg of wet cake. The wet cake was dried in a vacuum oven at 45° C. to afford 128 mg of crystalline compound IB in the N-1 form.

Preparation of Crystalline Compound IB, Form N-2

Preparation of Crystalline Compound IB, Form N-2 Seed Crystals

A solution was prepared by combining 20 ml of acetone and 300 mg of compound IA (N-(4-{[6,7-bis(methyloxy)quinolin-4-yl]oxy}phenyl)-N'-(4-fluorophenyl)cyclopropane-1,1-dicarboxamide) in a 25 ml screw capped vial. Next, 0.758 ml of a 0.79M (L)-malic acid stock solution was added to the vial with magnetic stirring. The solution was then left stirring for 24 hours at ambient temperature. The sample was then suction filtered with 0.45 μm PTFE filter cartridge and dried in vacuo at ambient temperature overnight.

Preparation of Crystalline Compound IB, Form N-2.

To a reactor were added N-(4-{[6,7-bis(methyloxy)-quinolin-4-yl]oxy}phenyl)-N'-(4-fluorophenyl)cyclopropane-1,1-dicarboxamide (48 g; 1.00 equiv; 48.00 g) and tetrahydrofuran (16.5 mL/g-bulk-LR; 792.00 mL). The water content was adjusted to 1 wt % water. The solution was heated to 60° C. Once dissolved, the solution was passed through a polish filter to provide the first solution.

In a separate reactor, (L)-malic acid (1.2 equiv (molar); 15.40 g) was dissolved into methyl isobutyl ketone (10 mL/g-bulk-LR; 480.00 mL) and tetrahydrofuran (1 mL/g-bulk-LR; 48.00 mL). Next, 50 mL of the (L)-malic acid solution was added to the first solution at 50° C. Seed crystals were added (1%, 480 mg) and the malic acid solution was added at 50° C. dropwise via an addition funnel (1.3 ml/min over 3 hours). The slurry was held at 50° C. for 18 hours and then was cooled to 25° C. over 30 minutes. The solids were filtered, and washed with 20% tetrahydrofuran/methyl isobutyl ketone (10V, 480 mL). The solids were dried

US 12,128,039 B2

**31**

under vacuum at 60° C. for 5 hours to afford compound IB (55.7 g; 0.92 equivalent; 55.70 g; 91.56% yield) as an off-white crystalline solid.

Stability Studies of Pharmaceutical Compositions

The pharmaceutical capsule compositions of Tables 3 and 4 were prepared by mixing the ingredients according to processes known in the art.

TABLE 3

| Ingredient | mg/unit dose |
| --- | --- |
| Compound IB (10% drug load as Compound IA) | 25 |
| Microcrystalline Cellulose | 196.75 |
| Croscarmellose sodium | 12.5 |
| Sodium starch glycolate | 12.5 |
| Fumed Silica | 0.75 |
| Stearic acid | 2.5 |
| Total Fill Weight | 250 |

**32**

TABLE 4

| Ingredient | mg/unit dose |
| --- | --- |
| Compound IB (50% drug load as Compound IA) | 100 |
| Silicified Microcrystalline Cellulose | 75.40 |
| Croscarmellose sodium | 10.00 |
| Sodium Starch Glycolate | 10.00 |
| Fumed silica | 0.6 |
| Stearic Acid | 4.0 |
| Total Fill Weight | 200 |

The capsule compositions were subjected to stability studies to monitor the formation of 6,7-dimethoxy-quinoline-4-ol at various temperatures and relative humidities over time. The results are summarized in Tables 7A and 7B and Tables 8A and 8B.

TABLE 7A

Stability of 25 Mg Capsules (Table 3)

| | Conditions | Bottle A1 | Bottle A2 | Bottle A3 | Bottle A4 |
| --- | --- | --- | --- | --- | --- |
| | | | PPM of 6,7-dimethoxy-quinoline-4-ol | | |
| Initial T = 0 | 25° C./60% RH | 2 | 2 | 3 | 3 |
| 1 Month | 25° C./60% RH | 3 | 4 | 5 | NA |
| | 30° C./75% RH | 4 | 4 | NA | NA |
| | 40° C./75% RH | 9 | 9 | 10 | NA |
| 3 Months | 25° C./60% RH | 5 | 5 | 7 | NA |
| | 30° C./75% RH | 7 | 6 | NA | NA |
| | 40° C./75% RH | 22 | 23 | 24 | NA |
| 6 Months | 25° C./60% RH | 6 | 6 | 7 | 7 (3M in blister) |
| | 30° C./75% RH | 9 | 9 | NA | NA |
| | 40° C./75% RH | 40 | 44 | 43 | 27 (3M in blister) |
| 9 Months | 25° C./60% RH | 7 | 7 | 9 | 8 (6M in blister) |
| | 30° C./75% RH | 13 | 12 | NA | NA |
| | 40° C./75% RH | NA | NA | 68 | 60 (6M in blister) |

M = Months;
NA = Not Applicable;
RH = Relative Humidity;
PPM = Parts per Million.
A portion of Bottle A4 was repackaged in a blister pack after being stored in bottles for 3 months.

TABLE 7B

Stability of 25 Mg Capsules (Table 3)

| | Conditions | Bottle B1 | Bottle B | Bottle B3 | Bottle B4 |
| --- | --- | --- | --- | --- | --- |
| | | | PPM of 6,7-dimethoxy-quinoline-4-ol | | |
| Initial T = 0 | 25° C./60% RH | 3 | 1 | 2 | 2 |
| 1 Month | 25° C./60% RH | <2 | <2 | <2 | NA |
| | 30° C./75% RH | <2 | <2 | NA | NA |
| | 40° C./75% RH | 2 | <2 | <2 | NA |
| 3 Months | 25° C./60% RH | 2 | <2 | <2 | NA |
| | 30° C./75% RH | 2 | <2 | NA | NA |
| | 40° C./75% RH | 3 | <2 | <2 | NA |
| 6 Months | 25° C./60% RH | <2 | <2 | <2 | <2 (3M in blister) |
| | 30° C./75% RH | 2 | <2 | NA | NA |
| | 40° C./75% RH | 4 | <2 | 3 | 3 (3M in blister) |
| 9 Months | 25° C./60% RH | <2 | <2 | <2 | <2 (6M in blister) |
| | 30° C./75% RH | 3 | <2 | NA | NA |
| | 40° C./75% RH | NA | NA | 5 | 4 (6M in blister) |

A portion of Bottle B4 was repackaged in a blister pack after being stored in bottles for 3 months.

US 12,128,039 B2

<table>
<tr><td colspan="2">33</td></tr>
</table>

## TABLE 8A

| | | Bottle A1 | Blister A2 | Bottle A3 |
|---|---|---|---|---|
| Conditions | | PPM of 6,7-dimethoxy-quinoline-4-ol | | |

Stability of 100 Mg Capsules (Table 4)

| | Conditions | Bottle A1 | Blister A2 | Bottle A3 |
|---|---|---|---|---|
| Initial T = 0 | 25° C./60% RH | 4 | 4 | 6 |
| 1 Month | 25° C./60% RH | 4 | 4 | 6 |
| | 30° C./75% RH | 4 | NA | 6 |
| | 40° C./75% RH | 6 | 6 | 9 |
| 3 Months | 25° C./60% RH | 5 | 5 | 7 |
| | 30° C./75% RH | 6 | NA | 7 |
| | 40° C./75% RH | 10 | 10 | 12 |
| 6 Months | 25° C./60% RH | 5 | 5 | |
| | 30° C./75% RH | 6 | NA | |
| | 40° C./75% RH | 11 | 17 | |

M = Months;

NA = Not Applicable;

RH = Relative Humidity;

PPM = Parts per Million.

## TABLE 8B

Stability of 100 Mg Capsules (Table 4)

| | Conditions | Bottle B1 | Blister B2 | Bottle B3 |
|---|---|---|---|---|
| | | PPM of 6,7-dimethoxy-quinoline-4-ol | | |
| Initial T = 0 | 25° C./60% RH | 1 | 1 | 2 |
| 1 Month | 25° C./60% RH | <2 | <2 | <2 |
| | 30° C./75% RH | <2 | <2 | 2 |
| | 40° C./75% RH | <2 | <2 | 2 |
| 3 Months | 25° C./60% RH | <2 | <2 | <2 |
| | 30° C./75% RH | <2 | NA | <2 |
| | 40° C./75% RH | <2 | <2 | 2 |
| 6 Months | 25° C./60% RH | <2 | <2 | |
| | 30° C./75% RH | <2 | NA | |
| | 40° C./75% RH | 2 | 2 | |

M = Months;
NA = Not Applicable;
RH = Relative Humidity;
PPM = Parts per Million.

The results summarized in Tables 7A and 7B and 8A and 8B indicate that formation of 6,7-dimethoxy-quinoline-4-ol was minimized to 50 ppm or less over time in the capsule formulations.

The foregoing disclosure has been described in some detail by way of illustration and example, for purposes of clarity and understanding. The invention has been described with reference to various specific and preferred embodiments and techniques. However, it should be understood that many variations and modifications can be made while remaining within the spirit and scope of the invention. It will be obvious to one of skill in the art that changes and modifications can be practiced within the scope of the appended claims. Therefore, it is to be understood that the above description is intended to be illustrative and not restrictive. The scope of the invention should, therefore, be determined not with reference to the above description, but should instead be determined with reference to the following appended claims, along with the full scope of equivalents to which such claims are entitled. All references cited herein are incorporated by reference in their entirety.

<table>
<tr><td colspan="2">34</td></tr>
</table>

The invention claimed is:

1. A pharmaceutical composition for oral administration comprising Compound IB:

and a pharmaceutically acceptable carrier, wherein the pharmaceutical composition is a tablet or a capsule, and wherein the pharmaceutical composition contains 100 ppm or less of 6,7-dimethoxy-quinoline-4-ol.

2. The pharmaceutical composition of claim 1, wherein the pharmaceutical composition contains 50 ppm or less of 6,7-dimethoxy-quinoline-4-ol.

3. The pharmaceutical composition of claim 2, wherein the pharmaceutical composition contains 25 ppm or less of 6,7-dimethoxy-quinoline-4-ol.

4. The pharmaceutical composition of claim 3, wherein the pharmaceutical composition contains 10 ppm or less of 6,7-dimethoxy-quinoline-4-ol.

5. The pharmaceutical composition of claim 4, wherein the pharmaceutical composition contains 5 ppm or less of 6,7-dimethoxy-quinoline-4-ol.

6. A method of treating cancer, comprising administering to a subject in need thereof a pharmaceutical composition comprising Compound IB:

and a pharmaceutically acceptable carrier, wherein the pharmaceutical composition is a tablet or a capsule, and wherein the pharmaceutical composition contains 100 ppm or less of 6,7-dimethoxy-quinoline-4-ol.

7. The method of claim 6, wherein the pharmaceutical composition contains 50 ppm or less of 6,7-dimethoxy-quinoline-4-ol.

8. The method of claim 7, wherein the pharmaceutical composition contains 25 ppm or less of 6,7-dimethoxy-quinoline-4-ol.

US 12,128,039 B2

35 36

**9**. The method of claim **8**, wherein the pharmaceutical composition contains 10 ppm or less of 6,7-dimethoxy-quinoline-4-ol.

**10**. The method of claim **9**, wherein the pharmaceutical composition contains 5 ppm or less of 6,7-dimethoxy-quinoline-4-ol.

**11**. The method of claim **6**, wherein the cancer is renal cancer.

**12**. The method of claim **6**, wherein the cancer is prostate cancer.

**13**. The method of claim **6**, wherein the cancer is hepatocellular carcinoma.

**14**. The method of claim **7**, wherein the cancer is renal cancer.

**15**. The method of claim **7**, wherein the cancer is prostate cancer.

**16**. The method of claim **7**, wherein the cancer is hepatocellular carcinoma.

**17**. The method of claim **8**, wherein the cancer is renal cancer.

**18**. The method of claim **8**, wherein the cancer is prostate cancer.

**19**. The method of claim **8**, wherein the cancer is hepatocellular carcinoma.

**20**. The method of claim **9**, wherein the cancer is renal cancer.

**21**. The method of claim **9**, wherein the cancer is prostate cancer.

**22**. The method of claim **9**, wherein the cancer is hepatocellular carcinoma.

* * * * *

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

EXELIXIS, INC.,

Plaintiff,

v.

MSN LABORATORIES PRIVATE
LIMITED., et al.,

Defendants.

C.A. No. 24-1208-RGA

**CONSOLIDATED**

**HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY**

**OPENING EXPERT REPORT OF WILLIAM DICHTEL, PH.D.
REGARDING INVALIDITY OF U.S. PATENT NOS. 11,298,349 AND 12,128,039**

Date: April 23, 2026

_____

William Dichtel, Ph.D.

least two methods of manufacturing cabozantinib (L)-malate, as shown in Examples 1A and 1B. '886 patent at Example 1A and 1B.

## X. THE ASSERTED CLAIMS WOULD HAVE BEEN OBVIOUS UNDER 35 U.S.C. § 103(A) (PRE-AIA)

151. I understand from counsel that part of the obviousness analysis is to compare the Asserted Claims with the prior art and to determine if the claimed subject matter would have been obvious to a POSA in view of the prior art.

152. Brown teaches the preparation of cabozantinib (L)-malate ("Compound IB"), the preparation of tablet and capsule dosage forms, and the use of cabozantinib (L)-malate to treat cancer, including the specific cancer indications claimed in the '039 patent. *See generally* Brown. As discussed in further detail below, the synthesis of cabozantinib (L)-malate prepared by the Brown process also inherently yields cabozantinib (L)-malate containing the 1-1 Impurity at levels satisfying certain of the claimed impurity limitations.

153. Moreover, the low levels of the 1-1 Impurity claimed by the Asserted Claims would have also been obvious from Brown in view of Robinson and other prior art. Regulatory guidance required the identification and evaluation of starting materials, anticipated reaction products, and impurities with known or suspected genotoxic or carcinogenic potential. *See* FDA GTI Guidance at 1. Because the 1-1 Impurity was both a starting material and an expected impurity[5] in cabozantinib (L)-malate, a POSA would have been motivated to test for it and to limit its amount in both the API and the finished pharmaceutical composition. Robinson and other prior art teach

---

[5] I understand Exelixis's litigation experts previously stated that a POSA would have expected Brown's cabozantinib (L)-malate to potentially contain genotoxic 1-1 Impurity, even if in *de minimis* amounts. *See* MSN Trial Op. at 46, 52-53; *see also* MSN Trial Transcript Vol. III at 708:23-709:19 (Exelixis's expert stating "we would not expect any significant amount of [the 1-1 Impurity] to carry through. We just would expect it to be de minimis."). This testimony further supports my opinion.

168.    Regulatory guidance required the identification and evaluation of starting materials, anticipated reaction products, and impurities with known or suspected genotoxic or carcinogenic potential. *See* FDA GTI Guidance at 1. Because the 1-1 Impurity was both a starting material and an impurity in cabozantinib (L)-malate, a POSA would have been motivated to test for it and to limit its amount in both the API and the finished pharmaceutical composition. *Id.* That regulatory framework would have led a POSA directly to the type of impurity limitations recited in the asserted claims.

169.    The patents confirm that obvious excipients, such as those disclosed in Remington, could be used to prepare a capsule composition containing the 1-1 Impurity at less than the amounts claimed by the Asserted Claims. *See* '349 patent at Table 7A-7B.[9]

170.    As such, once a POSA begins with API having the requisite purity—as the Impurity Patents' own data demonstrate—preparing the claimed compositions while maintaining the claimed impurity limits would have been obvious. The remaining question is whether obtaining such API would itself have been obvious. In my opinion, it would have been.

           **a.**    **Cabozantinib (L)-malate exhibiting the purity limitations for certain claims would have been inherently obvious in view of Brown**

171.    In my opinion, the "Brown Process"—the synthetic route and stepwise narrative description for synthesizing cabozantinib (L)-malate disclosed in Example 1 of Brown—inherently yields cabozantinib (L)-malate containing the 1-1 Impurity at levels satisfying certain of the claimed limitations. Specifically, if a POSA faithfully follows the Brown Process, as Regis

---

[9] I understand the Court has previously found that result was not unexpected (*see* MSN Trial Op. at 47), especially given the use of common, well-known excipients in combination with cabozantinib (L)-malate, which Exelixis's expert described as an inherently "very, very, very, stable compound." *See* MSN Trial Transcript Vol. II at 661:9-663:11.

did, the POSA would necessarily and inherently obtain cabozantinib (L)-malate containing 200 ppm or less, 100 ppm or less, and/or 50 ppm or less of the 1-1 Impurity.

172.    Brown describes the preparation of cabozantinib (L)-malate, identified as "Compound (I)" in Scheme 1:

**SCHEME 1**

Brown at [0099]; *see also id*. at [0098]-[0212].

173.    Brown does not report any 1-1 Impurity detected in the resulting cabozantinib (L)-malate. *See id*. However, Brown expressly teaches that "[t]he presence of reaction impurities and/or processing impurities may be determined by analytical techniques known in the art, such as, for example, chromatography, nuclear magnetic resonance spectroscopy, mass spectroscopy,

54

and/ or infrared spectroscopy." *See id*. at [0097]. Brown further discloses that its process is intended to prepare "substantially pure" cabozantinib (L)-malate. Brown at ¶¶ [0059]-[0060]. Brown also discloses that that "substantially pure" includes a purity of "about 100% wt %, based on the weight of the crystalline form" of cabozantinib (L)-malate. Brown at ¶ [0097]. Brown further teaches that administration of cabozantinib (L)-malate "in pure form" "in an appropriate pharmaceutical composition" is preferred. *Id*. at ¶ 87. And regardless of whether *expressly* taught by Brown, the Brown Process *inherently* discloses obtaining cabozantinib (L)-malate with levels of 1-1 Impurity below the claimed limits.

       i.       **The scientific principles underlying the Brown Process confirm that any 1-1 Impurity would be below claimed limitations.**

174.    Several scientific principles of organic chemistry explain why the Brown Process inherently produces cabozantinib (L)-malate with levels of 1-1 Impurity below the claimed limits.

175.    *First*, the initial reaction would consume the vast majority of the starting material. The 1-1 Impurity is the starting material for the Brown Process, but Brown discloses that the first step of the Brown Process is not complete until there is "<2%" starting material remaining. Brown at [0102] (based on in-process high-performance liquid chromatography (HPLC) analysis). Although the 1-1 Impurity is present as a starting material, the vast majority of the starting material is consumed immediately in the process.

176.    *Second*, any residual starting material would not be expected to survive the entire Brown Process in any significant amount. The Brown Process includes seven intermediate steps. Brown at [0098]-[0134]. And in order for a starting material at step 1 to end up in the final drug substance, it must carry through each subsequent step. But each step includes its own purifications and workups. For example, in step one, the product is "crystallized out," which would further

55

reduce the amount of starting material—which had already been consumed to "<2%"—such that little, if any, would be retained at the next step of the synthetic process. Brown at [0102]. Subsequent intermediates were also crystallized. These successive crystallizations would purge any 1-1 Impurity to very low levels. Any small amount of 1-1 impurity present after the early reaction and purification steps of the Brown process might also react with electrophiles used later in the synthesis, thus converting the 1-1 impurity to a different impurity (which would itself be removed by downstream purification steps).

177.    *Third*, any degradation would be expected to be insignificant. In order for the 1-1 Impurity to form as a degradation product, the biaryl ether bond of cabozantinib (or an intermediate in the Brown Process) would need to degrade. But biaryl ether bonds are stable, and the biaryl ether bond of cabozantinib (and the intermediates in the Brown Process) would not degrade under the conditions described in the Brown Process. In particular, hydrolysis of the biaryl ether bond would not be expected to occur in any significant amount under the conditions described by the Brown Process. And if even a small amount of a degradation reaction produced the 1-1 Impurity, this impurity would also have been removed either through the sequential crystallization of the intermediate products (described above) or through the crystallization of the final product (described below).

178.    *Fourth,* the final crystallization of the cabozantinib (L)-malate salt would be expected to purge residual 1-1 Impurity from the starting material—to the extent any remained at this step of the process. And the final crystallization would be expected to purge 1-1 Impurity due to any degradation or byproduct formation—to the extent any occurred at all.

179.    These scientific principles explaining why the Brown Process inherently produces cabozantinib (L)-malate with very low levels of 1-1 Impurity are corroborated by the data

described below from Regis Technologies, Inc. ("Regis"), which manufactured three batches of cabozantinib (L)-malate, identified by Lot Nos. P163-183-1, P172-27-1, and P188-144-1 (the "Regis Batches"). *See, e.g.*, Exelixis NDA No. 203756, Cometriq®, Section 3.2.S.2.6 Manufacturing Process Development (EXEL_01304807–EXEL_01304822 at EXEL_01304815); Exelixis NDA No. 208692, Cabometyx®, Section 3.2.S.2.6 Manufacturing Process Development (EXEL_00022546–EXEL_00022560 at EXEL_00022554).

      ii.      **The three Regis Batches confirm that Brown inherently yields cabozantinib (L)-malate containing the 1-1 Impurity at levels satisfying certain of the claimed limitations**

180.    Three batches prepared by Regis confirm that the Brown Process inherently produces cabozantinib (L)-malate containing 200 ppm or less, 100 ppm or less, and 50 ppm or less of the 1-1 Impurity.

181.    The batch records for these three Regis Batches detail the synthetic scheme, detailed procedural information, and analytical data for each step in the process Regis used to manufacture each batch. I reviewed these batch records and compared them to the narrative description of the Brown Process—confirming that each of the three Regis Batches faithfully followed the Brown Process. *See* REGIS0000001-REGIS0001758 (Regis batch records).

182.    As an initial matter, it is important to clarify that a faithful reproduction of a chemical process such as the Brown Process does not require precisely copying each experimental parameter. Processing and reagent parameters such as reaction time, batch size, temperature, volumes of solvents, etc., may be adjusted to accommodate different manufacturing needs—such as scaling up production—while still following the same fundamental process. For example, these variations are routinely made during pharmaceutical manufacturing to adapt to the requirements of larger-scale operations. The equipment used in a bench lab (e.g., glassware) differs from the

# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

EXELIXIS, INC.,

                Plaintiff,

v.

MSN LABORATORIES PRIVATE
LIMITED and MSN
PHARMACEUTICALS INC., et al.

             Defendants.

**Civil Action No. 24-1208 (RGA)**

**(Consolidated)**

*Contains Highly Confidential Information*

**Opening Expert Report of Jonathan Steed, Ph.D.,**
**Related to Invalidity of the Asserted Claims of**
**U.S. Patent Nos. 11,298,349 and 12,128,039**

April 23, 2026

165.    Further, I am aware that there was previous litigation between Exelixis and MSN regarding the '349 Patent. In that case, the court found that "a POSA would know the 1-1 starting material is potentially genotoxic because it is a quinoline," that "[a] POSA would heed FDA guidance on how to deal with genotoxic impurities," and that "[a] POSA would be motivated to identify the 1-1 starting material as genotoxic." Trial Op., *Exelixis, Inc. v. MSN Labs. Private Ltd.*, C.A. No. 22-228-RGA, D.I. No. 186 (D. Del. Oct. 15, 2024) ("MSN Trial Op.") at 45. For the same reasons as in that case, a POSA would have identified 6,7-dimethoxy-quinoline-4-ol as a potential GTI and been motivated to heed FDA guidance on how to deal with that potentially genotoxic impurity.

### C.    A POSA would have been motivated to recrystallize the cabozantinib (L)-malate to purge any 1-1 impurity to below the levels in the Asserted Claims with a reasonable expectation of success.

166.    A POSA would have been motivated with a reasonable expectation of success to employ recrystallization to purge any 1-1 impurity from the cabozantinib (L)-malate drug substance manufactured according to the Brown process to below the levels in the Asserted Claims.

167.    As discussed above, a POSA would have identified the 1-1 impurity and determined that it was a GTI. Brown specifically identified cabozantinib (L)-malate for development as a pharmaceutical. *See* Brown at [0052]. As such, a POSA would have been motivated to ensure that this pharmaceutical product would comply with regulatory guidance. Robinson reviews guidelines applicable to cabozantinib (L)-malate's pharmaceutical development, discusses strategies for complying with these requirements, and provides examples of the pharmaceutical industry's compliance. *See* Robinson at Abstract. Thus, a POSA would have been motivated to apply Robinson's teachings to the development of cabozantinib (L)-malate.  Failure to do so would be unlikely to lead to a marketable pharmaceutical product. *Id*. Accordingly, a POSA would have

50

been motivated to purge any 1-1 impurity from the cabozantinib (L)-malate to very low ppm levels (i.e., below the levels in the Asserted Claims) to comply with the regulatory guidance on GTIs.

168.    "[I]f one or both of the genetic toxicology tests are positive," the regulatory guidance recommends "removal of the impurity … or lowering the level of the impurity." FDA GTI Guidance at EXEL_03294457. For a GTI such as 6,7-dimethoxy-quinoline-4-ol, regulatory guidance indicates that the concentration may be limited such that it remains below a level of concern (the threshold of toxicological concern or "TTC"). Robinson at 952; FDA Genotoxic Guidance at 7, 11 (Table 1); EMEA Guidance at 6-7. Such guidance teaches that the permissible concentration should range from less than 120 µg/day to less than 1.5 µg/day depending upon the duration of treatment.  Robinson at 948 (Table 1); FDA Genotoxic Guidance at 7, 11 (Table 1); EMEA Guidance at 6-7. As applied to cabozantinib, a POSA would have known from Plaintiff's earlier disclosures that the amount of API intended to be administered was "about 0.1 to about 1,000 mg per day." '473 patent at 274:52–57. Thus, a POSA could readily calculate the permissible concentration range for a GTI such as 6,7-dimethoxy-quinoline-4-ol.  For example, for a 1,000 mg per day dosage for cabozantinib disclosed in the '473 patent, the limit for 6,7-dimethoxy-quinoline-4-ol would have been 120 ppm or less to as low as 1.5 ppm or less for lower dosages or depending upon the duration of treatment. *See* Robinson at 948 (Table 1); FDA Genotoxic Guidance at 7, 11 (Table 1), 12 (Table 2); EMEA Guidance at 6 (Eq. 1) (substituting 1,000 mg or 1 g as the dose and either 120 µg/day or 1.5 µg/day as the Threshold of Toxicological Concern).

169.    To remove a GTI, the regulatory guidance recommends "technical effort should be made post-synthesis to reduce impurities (e.g., purification steps)." FDA GTI Guidance at EXEL_03294465; *see also* FDA GTI Guidance at EXEL_03294455 ("Changing the synthetic

51

and/or purification routes to minimize the formation and/or maximize the removal of the relevant impurity.").

170. The obvious design choice for a "purification step" or "purification route" would be to recrystallize the drug substance. Specifically, FDA recommended the use of recrystallization, a conventional, highly effective method to purify API. FDA Manufacturing Guidance recommended "recrystallization" for API that did not meet specification. FDA Manufacturing Guidance at 52 ("reprocessed by repeating a crystallization step").

### 1. A POSA would readily know how to conduct a recrystallization of cabozantinib (L)-malate.

171. A POSA motivated to conduct a recrystallization of cabozantinib (L)-malate, as in case discussed here, would readily know how to do so. Crystallization is one of the most frequently performed operations in practical organic chemistry. *See supra* at Section VII.A.1-2; *see also* Shekunov at 122 ("Solution crystallization is widely used for manufacturing bioactive drug substances and formulation excipients during final and intermediate stages of purification and separation[.]").

172. Brown teaches several different crystallization procedures for isolating cabozantinib (L)-malate, each of which could be adopted to perform a recrystallization. Brown at [0113]–[0114] ("Preparation of … (L) malate salt (Compound (I)"); Brown at [0115] ("Preparation of Crystalline Compound (I), Form N-1"); Brown at [0118] ("Alternate Preparation of Crystalline Compound (I), Form N-1"); Brown at [0122] ("Preparation of Crystalline Compound (I), Form N-2").

173. If recrystallization using those conditions described in Brown did not adequately purge the 1-1 impurity, a POSA would have readily known how to design a recrystallization. "Crystallization is a very old technology and … goes back to the beginning of civilization."

would understand how "to select solvents and optimize processing conditions to greatly improve the purification of crystalline materials." Myerson 2002 at 96. For example, the use of ethanol as a solvent has been reported "to improve purity through a reduced number of liquid inclusions." Myerson 2002 at 77.

189. In sum, a POSA would not expect the 1-1 impurity to substitute into the cabozantinib (L)-malate crystal lattice. A POSA would expect crystallization to work as a purification technique. Lattice substitution by impurities is the "rare" exception to that rule. Myerson 2002 at 72.

### c. A POSA would not expect the cabozantinib molecule to degrade during a recrystallization.

190. Biaryl ethers are known to be stable compounds, and thus, a POSA would not expect the cabozantinib free base or malate salt to degrade under recrystallization conditions. Recrystallization includes conditions such as heating the desired material in a solvent system to reflux. Even under those conditions, however, a POSA looking at the structure of cabozantinib free base or cabozantinib (L)-malate, would have found cleavage of the biaryl ether bond in cabozantinib free base or cabozantinib (L)-malate via hydrolysis unlikely.

191. Brown also includes data that would have corroborated a POSA's belief that cabozantinib was a stable molecule. Brown contains detailed characterization data for crystalline Forms N-1 and N-2, including thermogravimetric analysis (TGA), differential scanning calorimetry (DSC), and moisture sorption data.

192. DSC can be used to distinguish the different crystal forms of a drug compound based on their different melting points. Melting is generally evident as an absorption of heat (endotherm), as heat is input to break up the lattice of a crystalline solid. DSC is a quantitative

61

technique, and the area under the peak in a DSC plot (thermogram) is proportional to the heat absorbed or given off in a particular process.

193.   Thermogravimetric analysis (TGA) is a technique that involves heating a sample at a controlled rate, typically in an inert atmosphere. The mass of the sample is monitored during the heating process and the results presented as a plot of percentage mass versus temperature. Non-solvated compounds will typically give rise to a flat line at 100% mass up until the point at which they undergo chemical decomposition at very high temperatures (several hundreds of degrees Celsius). Solvated compounds will lose solvent (i.e., some of their mass) upon heating. If the identity of the solvent is known, then the amount of mass loss gives an indication of the amount of solvent in the solid sample.

194.   Brown reported that "[t]he DSC/TGA showed [cabozantinib (L)-malate] to be stable up to 185°C." Brown at [0052]. Brown also reported that cabozantinib (L)-malate demonstrated "chemical/physical stability." Brown at Table 1. These properties would have affirmed a POSA's believe that cabozantinib (L)-malate would be unlikely to degrade during any recrystallization process.

195.   Given the expected stability of the molecule, a POSA would not expect any degradation of the cabozantinib molecule during the recrystallization. For instance, a POSA would not expect degradation of the molecule's bi-aryl ether bond. *See, e.g.*, Brown at [0052]; March 12, 2026 Wilson Tr. at 168:4–25 ("So some degradation is acceptable … But I wouldn't say that we expected that to happen.").

      **d.**     **A POSA would have reasonably expected to have been able to modify recrystallization parameters to address any substitution or degradation impurities, to the extent they arose.**

196.   As discussed above, a POSA would not expect the 1-1 impurity to substitute into the crystal lattice or to degrade during the recrystallization process. If the 1-1 impurity did

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| EXELIXIS, INC.,<br><br>                    Plaintiff,<br><br>v.<br><br>MSN LABORATORIES PRIVATE LIMITED et al.<br><br>                    Defendants. | C.A. No. 1:24-cv-01208-RGA<br>(Consolidated)<br><br>***Contains Highly Confidential Information*** |

## OPENING EXPERT REPORT OF DR. MAUREEN DONOVAN REGARDING INVALIDITY OF U.S. PATENT NOS. 11,298,349 AND 12,128,039

Dated: April 23, 2026

Maureen D. Donovan, Ph.D.

to try using each and every one of these excipients in a cabozantinib (L)-malate formulation. *Supra* §§ VII.C, VIII.B. In other words, there was market pressure to design a cabozantinib formulation, there are a finite number of types of excipients, and it would have been obvious to try using a filler, disintegrant, and glidant to achieve the formulation with a reasonable expectation of success.

### 3. A POSA would have been motivated and found it obvious to prepare a pharmaceutical composition wherein the pharmaceutical composition is 200 ppm or less, 100 ppm or less, 50 ppm or less, 25 ppm or less, 10 ppm or less, and/or 5 ppm of 6,7-dimethoxy-quinoline-4-ol with a reasonable expectation of success.

226. I understand from Dr. Dichtel that the prior art, specifically the Brown reference, discloses a process for manufacturing the (L)-malate salt of cabozantinib that inherently results in a compound that is at least 200 ppm or less, 100 ppm or less, and 50 ppm or less of 6,7-dimethoxy-quinoline-4-ol. Dichtel Opening Report at § X.A.2. Moreover, I understand from Dr. Dichtel and Dr. Steed, and based on my own knowledge and review of the prior art, that even if the prior art did not inherently disclose a compound having the claimed impurity level, a POSA would have been motivated to add a routine crystallization step to the manufacturing process to further purify the compound, including to reach an impurity level as low as 5 ppm or less. *Id.* at § X.A.2; Steed Opening Report at § VIII.C. I understand that through these steps, a POSA would have been motivated to obtain an (L)-malate salt of cabozantinib that is 200 ppm or less, 100 ppm or less, 50 ppm or less, 25 ppm or less, 10 ppm or less, and/or 5 ppm or less of 6,7-dimethoxy-quinoline-4-ol and would have a reasonable expectation of success in preparing such a compound. *Id.*

227. I further understand from Dr. Dichtel, Dr. Steed, and Dr. Ashworth, and based on my own knowledge and review of the prior art, that a POSA would have been motivated to minimize genotoxic impurities in drug compounds. Steed Opening Report at § VIII.C; Dichtel Opening Report at §§ VIII.B, X.A.2; Ashworth Opening Report at § IV.C. When synthesizing APIs and preparing a pharmaceutical product, it is well known that unwanted impurities "may

have deleterious pharmacological and toxicological activities" and, therefore, "**must** be removed from the final product." *See* Gibson at 190 (emphasis added). Accordingly, the identification of impurities is "a crucial activity in drug substance" research and development. *Id.* This effort is so "crucial" that it is well understood that "every feasible technical effort should be made to prevent the formation of genotoxic or carcinogenic compounds during drug substance synthesis or drug product manufacturing." FDA, Guidance for Industry: Genotoxic and Carcinogenic Impurities in Drug Substances and Products, ("FDA Manufacturing Guidance 2008") EXEL_03294451 at EXEL_03294460. Accordingly, regulatory authorities publish guidelines concerning various impurities "with the expectation that pharmaceutical companies will comply with them." Gibson at 314.

228. Normally, the limit for any particular impurity is 0.15%, which corresponds to 1500 parts per million (ppm). *See* Robinson at 946. However, "potentially genotoxic impurities ["PGIs"] have been the subject of increasing regulatory and industry attention since the beginning of the 21st century." *Id.* at 959. Such impurities are subject to additional restrictions regarding permissible concentration ranges. *See id.* at 947-48, Table 1; FDA Genotoxic Guidance at 7, 11 (Table 1); EMEA Guidance at 6-7. Indeed, using either "existing genotoxicity data or the presence of structural alerts, potential genotoxic impurities should be identified." EMEA Guidance at 4; Robinson at 947. If PGIs are present, regulatory guidance indicates that the developer should (1) "alter the route of synthesis so as to **remove the PGI entirely**"; (2) "reduce the PGI to below a level of concern"; (3) "demonstrate that the PGI will not be present at significant levels"; or (4) "demonstrate that the PGI is not actually harmful at its typical level in the API." Robinson at 952 (emphasis added). In any event, a POSA would have known that ignoring a PGI is not an option.

229. Thus, a POSA would have been motivated to purify cabozantinib (L)-malate to

minimize the amount of 6,7-dimethoxy-quinoline-4-ol as much as possible. I further understand that purification techniques were well known and would provide a POSA with a reasonable expectation of success in manufacturing the (L)-malate salt of cabozantinib that has 200 ppm or less, 100 ppm or less, 50 ppm or less, 25 ppm or less, 10 ppm or less, and/or 5 ppm or less of 6,7-dimethoxy-quinoline-4-ol.

230.    Given that the claimed cabozantinib (L)-malate API at 200 ppm or less, 100 ppm or less, 50 ppm or less, 25 ppm or less, 10 ppm or less, and/or 5 ppm or less of 6,7-dimethoxy-quinoline-4-ol was explicitly and/or inherently disclosed in the prior art, a POSA would have been motivated and found it obvious to prepare a pharmaceutical composition wherein the final drug product remains at 200 ppm or less, 100 ppm or less, 50 ppm or less, 25 ppm or less, 10 ppm or less, and/or 5 ppm or less of 6,7-dimethoxy-quinoline-4-ol.

231.    In fact, in the specification of the '349 patent, the patentee concedes that the exemplary tablet and capsule formulations were prepared according to prior-art processes:

> [The formulations] according to Tables 1, 2, 2A, 3, 4, 5, and 6 as provided above. The compositions are prepared *according to methods available to the skilled artisan*. For example, the Tablet formulations are prepared by combining, blending, and compacting the components of the tablet compositions. The capsule compositions are prepared by combining and blending the components and then placing the blend in a gelatin capsule.

'349 patent at 21:37-45 (emphasis added).

232.    The patentee further states that "[t]he pharmaceutical capsule compositions of Tables 3 and 4 were prepared by mixing the ingredients *according to processes known in the art*." '349 patent at 30:65-67 (emphasis added). These formulations include cabozantinib (L)-malate, one or more fillers ("silicified microcrystalline cellulose"), one or more disintegrants (croscarmellose sodium and/or sodium starch glycolate), one or more glidants (fumed silica), and one or more lubricants (stearic acid). *See* Tables, 1, 2, 3, and 4. Thus, to the extent that Exelixis

73

argues that the prior art does not provide a POSA with sufficient information to enable a POSA to formulate the cabozantinib compound without increasing the level of 6,7-dimethoxy-quinoline-4-ol impurity, its own patents would be similarly deficient.[9]

233.    During prosecution, the applicant argued that "[t]he development of a storage-stable pharmaceutical composition of [cabozantinib (L)-malate] was made difficult because exposure to water, atmospheric moisture, or even residual moisture can cause degradation to form 6,7-dimethoxy-quinoline-4-ol"; however, the applicant provided no evidence (and there is no evidence in the prosecution history) that prior-art processes used to formulate cabozantinib (L)-malate caused degradation forming 6,7-dimethoxy-quinoline-4-ol. *See* '349 Patent File History, January 20, 2022 Decl. of Khalid Shah at 2-3.  For example, both the exemplary capsule and tablet formulations were exposed to water, atmospheric moisture, and/or heat, including for up to months at a time, but nonetheless they could be formulated to remain at 200 ppm or less, 100 ppm or less, 50 ppm or less, 25 ppm or less, 10 ppm or less, and 5 ppm or less of 6,7-dimethoxy-quinoline-4-ol.  *See, e.g.*, '349 patent at Table 8B.

234.    It is a fundamental tenet of formulating to avoid degradation of the API while making the drug product.  *Supra* § VII.C.3.d (incorporated herein).  A POSA would be aware of FDA guidance requiring strict impurity identification, monitoring, and limiting.  *See, e.g.*, ICH

---

[9] For the reasons stated herein, in my opinion the prior art provides sufficient information to enable a POSA to formulate cabozantinib that is 200 ppm or less, 100 ppm or less, 50 ppm or less, 25 ppm or less, 10 ppm or less, and/or 5 ppm or less of the 6,7-dimethoxy-quinoline-4-ol impurity in a way that yields a final drug product that is also 200 ppm or less of 6,7-dimethoxy-quinoline-4-ol impurity.  Formulators are well aware of the importance of avoiding degradants and impurities during the drug product manufacturing process, and ensuring that they avoid these degradants/impurities is a matter well within the knowledge and expertise of a POSA.  However, if Plaintiff argues that a POSA would be unable to do so or would not have a reasonable expectation of success in doing so, then based on its own rationale, its patents are insufficient to enable a POSA to practice the claimed inventions.  *See infra* § X.B.

74

# EXHIBIT E

| | |
|---|---|
| **From:** | Saunders, Thomas |
| **To:** | Boyle, Kevin; O"Gara, Brian L.; Laupheimer, Madeleine C; Pirozzolo, Lisa; Prussia, Kevin S; Salvatore, Jerry A.; Walker, Bella M; Wigmore, Amy |
| **Cc:** | Reig, Eimeric; Mathas, Kurt; Cooper, Bryce; Klein, Chuck |
| **Subject:** | RE: Exelixis v. MSN - 25-1236 (CAFC) - Article III Standing |
| **Date:** | Monday, June 1, 2026 2:01:19 PM |
| **Attachments:** | image001.png |

Kevin,

Following up on our meet and confer today, we understand MSN's position to be that it will not agree to any outcome that limits its ability to relitigate validity-related issues decided by the district court in connection with the '349 patent.  In other words, vacatur would leave a blank slate in Case No. 1:25-cv-346 (D. Del.) for MSN to relitigate even specific factual findings, such as the one I highlighted below, in a way that would not be true if the court's judgment on the '349 patent is affirmed.  As such, Exelixis believes there is still a live case or controversy and does not agree to the proposed stipulation.

There are numerous cases holding that the collateral or continuing effect of an order on other pending or imminent litigation maintains a live case or controversy.  In response to your request for examples, I will note briefly that in *DexCom, Inc. v. Abbot Diabetes Care, Inc.*, 89 F.4th 1370 (Fed. Cir. 2024), the Federal Circuit held that DexCom's contract-based challenge to Abbott's right to file an IPR was not moot even though DexCom ultimately won the IPR because the ruling would affect other potential proceedings beyond the case at hand.

Similarly, in *National Iranian Oil Co. v. Mapco International, Inc.*, 983 F.2d 485, 490 (3d Cir. 1992), the Third Circuit held that a dispute was not moot where the plaintiff "filed two other lawsuits" and the "district court's holding … would have a collateral estoppel effect in those actions."  The Third Circuit explained that a "case is not moot if there is a reasonable likelihood that the parties will relitigate the same issues in the future."

If you are going to file a motion, we ask that you please do so as soon as possible to allow time for a response before oral argument.  Further, given the compressed time frame creating by the timing of your motion and the opportunity to address the issues at argument, I wanted to let you know up front that we do not think it would be appropriate for MSN to file a post-argument reply brief.

Best,
Tom

**Tom Saunders | WilmerHale**

2100 Pennsylvania Avenue NW

Washington, DC 20037 USA

+1 202 663 6536 (t)

+1 202 663 6363 (f)

thomas.saunders@wilmerhale.com

---

**From:** Saunders, Thomas

**Sent:** Sunday, May 31, 2026 4:02 PM
**To:** 'Boyle, Kevin' <KJBoyle@winston.com>; O'Gara, Brian L. <BOGara@winston.com>; Laupheimer, Madeleine C <Madeleine.Laupheimer@wilmerhale.com>; Pirozzolo, Lisa <Lisa.Pirozzolo@wilmerhale.com>; Prussia, Kevin S <Kevin.Prussia@wilmerhale.com>; Salvatore, Jerry A. <Jerry.Salvatore@wilmerhale.com>; Walker, Bella M <Bella.Walker@wilmerhale.com>; Wigmore, Amy <Amy.Wigmore@wilmerhale.com>
**Cc:** Reig, Eimeric <EReigPlessis@winston.com>; Mathas, Kurt <KMathas@winston.com>; Cooper, Bryce <BCooper@winston.com>; Klein, Chuck <CKlein@winston.com>
**Subject:** RE: Exelixis v. MSN - 25-1236 (CAFC) - Article III Standing

Kevin,

I have a quick question in advance of our conversation tomorrow. For clarity, is MSN offering to stipulate that it will not relitigate any specific issues decided by the district court in connection with the '349 patent?

As you know from the parties' prior correspondence, there are a number of specific factual findings in *MSN II* that MSN is attempting to relitigate in *MSN III*. To cite just one example, Dr. Dichtel argues that "[t]hree batches prepared by Regis confirm that the Brown Process inherently produces cabozantinib (L)-malate containing 200 ppm or less, 100 ppm or less, and 50 ppm or less of the 1-1 Impurity." Dichtel Opening Expert Rpt. ¶ 180; *see also id*. ¶¶ 181-194." However, the district court reached a contrary conclusion in *MSN II*. *See* Appx46; Appx49-51.

This case does not involve collateral consequences in a hypothetical future case that may never be filed, of the type at issue in *Interactive Commc'ns Int'l, Inc. v. Blackhawk Network, Inc.*, No. 2025-1632, 2025 WL 2741614, at *2 (Fed. Cir. Sept. 26, 2025). There was and remains a live dispute between the parties that is affected by the '349 patent issues on appeal.

Best,
Tom

---

**From:** Boyle, Kevin <KJBoyle@winston.com>
**Sent:** Sunday, May 31, 2026 12:01 PM
**To:** Saunders, Thomas <Thomas.Saunders@wilmerhale.com>; O'Gara, Brian L. <BOGara@winston.com>; Laupheimer, Madeleine C <Madeleine.Laupheimer@wilmerhale.com>; Pirozzolo, Lisa <Lisa.Pirozzolo@wilmerhale.com>; Prussia, Kevin S <Kevin.Prussia@wilmerhale.com>; Salvatore, Jerry A. <Jerry.Salvatore@wilmerhale.com>; Walker, Bella M <Bella.Walker@wilmerhale.com>; Wigmore, Amy <Amy.Wigmore@wilmerhale.com>
**Cc:** Reig, Eimeric <EReigPlessis@winston.com>; Mathas, Kurt <KMathas@winston.com>; Cooper, Bryce <BCooper@winston.com>; Klein, Chuck <CKlein@winston.com>
**Subject:** RE: Exelixis v. MSN - 25-1236 (CAFC) - Article III Standing

Tom,

At the outset of the appeal, a controversy existed regarding the validity of the '349 patent given Exelixis's cross-appeal of the of the district court's finding of non-infringement. But Exelixis's voluntary dismissal of that cross-appeal rendered the non-infringement determination final and non-appealable. As a result, our obviousness appeal became moot. Accordingly, there is no longer a case or controversy between Exelixis and MSN with respect to the '349 patent. *See, e.g., Interactive Commc'ns Int'l, Inc. v. Blackhawk Network, Inc.*, No. 2025-1632, 2025 WL 2741614, at *2 (Fed. Cir. Sept. 26, 2025) (accused infringer had no standing to challenge FWD of no invalidity because of no "potential infringement activity").

We acknowledge that the parties dispute whether collateral estoppel or issue preclusion applies to the related '039 patent at issue in the pending district court litigation, however, the Federal Circuit has "repeatedly rejected ... [the] potential for collateral consequences of a decision as a sufficient basis, on its own, to confer standing." *Id*.

Under these circumstances, the underlying judgment should be vacated. The Supreme Court's decision in *United States v. Munsingwear, Inc.* "directs courts to vacate the underlying decision in certain appeals that have become moot during their pendency, 'clear[ing] the path for future relitigation.'" *Apple Inc. v. Qualcomm Inc.*, 17 F.4th 1131, 1136 (Fed. Cir. 2021) (alteration in original) (quoting 340 U.S. 36, 40, 71 S.Ct. 104, 95 L.Ed. 36 (1950) (a "motion to vacate the judgment" "is commonly utilized in precisely this situation to prevent a judgment, unreviewable because of mootness, from spawning any legal consequences.").

We are available Monday at 10am ET. I will follow up with a calendar invite.

Best,
Kevin



**KEVIN BOYLE**
ASSOCIATE ATTORNEY

**T**  +1 (312) 558-8138
kjboyle@winston.com

*Admitted to practice in Illinois, Wisconsin*

**From:** Saunders, Thomas <Thomas.Saunders@wilmerhale.com>
**Sent:** Saturday, May 30, 2026 2:51 PM
**To:** Boyle, Kevin <KJBoyle@winston.com>; O'Gara, Brian L. <BOGara@winston.com>; Laupheimer,

Madeleine C <Madeleine.Laupheimer@wilmerhale.com>; Pirozzolo, Lisa <Lisa.Pirozzolo@wilmerhale.com>; Prussia, Kevin S <Kevin.Prussia@wilmerhale.com>; Salvatore, Jerry A. <Jerry.Salvatore@wilmerhale.com>; Walker, Bella M <Bella.Walker@wilmerhale.com>; Wigmore, Amy <Amy.Wigmore@wilmerhale.com>
**Cc:** Reig, Eimeric <EReigPlessis@winston.com>; Mathas, Kurt <KMathas@winston.com>; Cooper, Bryce <BCooper@winston.com>; Klein, Chuck <CKlein@winston.com>
**Subject:** RE: Exelixis v. MSN - 25-1236 (CAFC) - Article III Standing

Kevin,

Thank you for your email.  We are discussing your proposal, but I am having a hard time seeing the argument that the Federal Circuit has lost Article III jurisdiction.  In light of that, I suggest that we go ahead and set up a time to talk in case it is needed, subject to our further review.  I am flexible on Monday morning.

Best,
Tom


**Tom Saunders | WilmerHale**
2100 Pennsylvania Avenue NW
Washington, DC 20037 USA
+1 202 663 6536 (t)
+1 202 663 6363 (f)
thomas.saunders@wilmerhale.com

---

**From:** Boyle, Kevin <KJBoyle@winston.com>
**Sent:** Saturday, May 30, 2026 1:56 PM
**To:** Saunders, Thomas <Thomas.Saunders@wilmerhale.com>; O'Gara, Brian L. <BOGara@winston.com>; Laupheimer, Madeleine C <Madeleine.Laupheimer@wilmerhale.com>; Pirozzolo, Lisa <Lisa.Pirozzolo@wilmerhale.com>; Prussia, Kevin S <Kevin.Prussia@wilmerhale.com>; Salvatore, Jerry A. <Jerry.Salvatore@wilmerhale.com>; Walker, Bella M <Bella.Walker@wilmerhale.com>; Wigmore, Amy <Amy.Wigmore@wilmerhale.com>
**Cc:** Reig, Eimeric <EReigPlessis@winston.com>; Mathas, Kurt <KMathas@winston.com>; Cooper, Bryce <BCooper@winston.com>; Klein, Chuck <CKlein@winston.com>
**Subject:** RE: Exelixis v. MSN - 25-1236 (CAFC) - Article III Standing


Counsel,

As you know, the Federal Circuit ordered that the parties should come to argument prepared to discuss whether MSN has Article III standing to appeal the final judgment of no invalidity for claim 3 of the '349 patent. After investigating this issue, our understanding is that Exelixis's dismissal of its cross-appeal of the district court's finding of non-infringement has eliminated any remaining case or controversy as to the

'349 patent such that MSN no longer has standing to appeal. Accordingly, the parties should jointly stipulate to dismiss the appeal as to the '349 patent under FRAP 42(b)(1) and to vacate the district court's final judgment of no invalidity for claim 3 of the '349 patent under 42(b)(3).

Given the upcoming oral argument, please let us know your position by Monday. If you disagree to entering a joint stipulation, we may file a motion under 42(b)(2), so please provide your availability to meet and confer on this issue. We're available Monday morning.

Best,
Kevin



**KEVIN BOYLE**
ASSOCIATE ATTORNEY

**T** +1 (312) 558-8138
kjboyle@winston.com

*Admitted to practice in Illinois, Wisconsin*

**From:** Cooper, Bryce <BCooper@winston.com>
**Sent:** Tuesday, May 5, 2026 4:02 PM
**To:** Saunders, Thomas <Thomas.Saunders@wilmerhale.com>; O'Gara, Brian L. <BOGara@winston.com>; Laupheimer, Madeleine C <Madeleine.Laupheimer@wilmerhale.com>; Pirozzolo, Lisa <Lisa.Pirozzolo@wilmerhale.com>; Prussia, Kevin S <Kevin.Prussia@wilmerhale.com>; Salvatore, Jerry A. <Jerry.Salvatore@wilmerhale.com>; Walker, Bella M <Bella.Walker@wilmerhale.com>; Wigmore, Amy <Amy.Wigmore@wilmerhale.com>
**Cc:** Reig, Eimeric <EReigPlessis@winston.com>; Mathas, Kurt <KMathas@winston.com>; Boyle, Kevin <KJBoyle@winston.com>
**Subject:** RE: Exelixis v. MSN - 25-1236 (CAFC) - Motion for Leave to Appear as Counsel

Tom,

Agreed, we are still planning for June 4.  Thank you.

Best,
Bryce

**BRYCE COOPER**



PARTNER

**T** +1 (312) 558-3737
bcooper@winston.com

*Admitted to practice in Illinois*

---

**From:** Saunders, Thomas <Thomas.Saunders@wilmerhale.com>
**Sent:** Tuesday, May 5, 2026 3:52 PM
**To:** O'Gara, Brian L. <BOGara@winston.com>; Laupheimer, Madeleine C <Madeleine.Laupheimer@wilmerhale.com>; Pirozzolo, Lisa <Lisa.Pirozzolo@wilmerhale.com>; Prussia, Kevin S <Kevin.Prussia@wilmerhale.com>; Salvatore, Jerry A. <Jerry.Salvatore@wilmerhale.com>; Walker, Bella M <Bella.Walker@wilmerhale.com>; Wigmore, Amy <Amy.Wigmore@wilmerhale.com>
**Cc:** Cooper, Bryce <BCooper@winston.com>; Reig, Eimeric <EReigPlessis@winston.com>; Mathas, Kurt <KMathas@winston.com>; Boyle, Kevin <KJBoyle@winston.com>
**Subject:** RE: Exelixis v. MSN - 25-1236 (CAFC) - Motion for Leave to Appear as Counsel

Exelixis does not oppose the motion, on the understanding that the appearance of another lawyer from Winston will not cause any recusal issues and therefore will not delay argument.

Best,
Tom

---

**From:** O'Gara, Brian L. <BOGara@winston.com>
**Sent:** Tuesday, May 5, 2026 4:07 PM
**To:** Saunders, Thomas <Thomas.Saunders@wilmerhale.com>; Laupheimer, Madeleine C <Madeleine.Laupheimer@wilmerhale.com>; Pirozzolo, Lisa <Lisa.Pirozzolo@wilmerhale.com>; Prussia, Kevin S <Kevin.Prussia@wilmerhale.com>; Salvatore, Jerry A. <Jerry.Salvatore@wilmerhale.com>; Walker, Bella M <Bella.Walker@wilmerhale.com>; Wigmore, Amy <Amy.Wigmore@wilmerhale.com>
**Cc:** Cooper, Bryce <BCooper@winston.com>; Reig, Eimeric <EReigPlessis@winston.com>; Mathas, Kurt <KMathas@winston.com>; Boyle, Kevin <KJBoyle@winston.com>
**Subject:** Exelixis v. MSN - 25-1236 (CAFC) - Motion for Leave to Appear as Counsel

**EXTERNAL SENDER**

Counsel,

MSN intends to file today a motion for leave to appear as counsel for Charles B. Klein in the above caption matter. Please let us know by 5:00 pm whether Exelixis is opposed.

Regards,

Case: 25-1236    Document: 64    Page: 79    Filed: 06/03/2026



**BRIAN O'GARA**
ASSOCIATE ATTORNEY

**T** +1 (312) 558-8773
bogara@winston.com

300 N. LaSalle Dr., Chicago, IL 60654-3406

*Admitted to practice in Illinois*

The contents of this message may be privileged and confidential. If this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author. Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under applicable tax laws and regulations.

# EXHIBIT F

| | |
|---|---|
| **From:** | Cox, Jonathan |
| **To:** | Boyle, Kevin; O"Gara, Brian L.; WH Exelixis; Gorka, Alexander; Cox, Charles T.; Pirozzolo, Lisa; Kan, Cindy; Wigmore, Amy; Mizzi, Anna; Cherry, Chris; Whelan, Emily; Salvatore, Jerry A.; Prussia, Kevin S; Lee, William; rdsefiling@mnat.com |
| **Cc:** | Cooper, Bryce; Mathas, Kurt; Dominick T. Gattuso; Steiner, Elham F.; Cross, Caryn L.; Delafield II, Robert A.; Fowler, Kiersten A.; Hodgson, Alissa; Cortlan S. Hitch; kdorsney@morrisjames.com |
| **Subject:** | RE: Exelixis v. MSN et al (24-cv-1208) - Service of Opening Expert Reports |
| **Date:** | Monday, May 18, 2026 8:07:41 PM |
| **Attachments:** | image001.png |

Counsel,

Thank you for meeting with us last week regarding the issues that Exelixis has raised in correspondence regarding Defendants' opening expert reports.  As we discussed, this conference was intended solely to focus on the issues of ███████████████, collateral estoppel, and obviousness-type double patenting.  Exelixis retains all rights with respect to the objections it has raised in correspondence.

During the conference, you confirmed that:

1. Defendants have disclosed ████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████

2. It is your position that, as the appeal in *Exelixis, Inc. v. MSN Lab'ys  Private Ltd. et al.*, C.A. No. 22-228-RGA, remains pending, and expert discovery is still ongoing, the issue of collateral estoppel is not yet ripe to raise with the Court.  To the extent that Exelixis brings this issue to the Court later in this matter, Defendants will not argue that Exelixis has improperly delayed or waived its right to do so.

3. It is Defendants' position that the issues of obviousness-type double patenting are best addressed for trial, and Defendants will not argue that Exelixis has waived its rights with respect to challenging Defendants' obviousness-type double patenting theories.

We are considering Defendants' positions and will respond in due course.

Best,

Jonathan

**Jonathan A. Cox | WilmerHale**
+1 617 526 6609
jonathan.cox@wilmerhale.com

---

**From:** Cox, Jonathan <Jonathan.Cox@wilmerhale.com>

# CERTIFICATE OF SERVICE

I hereby certify that, on this 3rd day of June, 2025, I filed the Appellee

Exelixis, Inc.'s Non-Confidential Opposition to Defendants-Appellants' Motion to

Dismiss Appeal as Moot and to Vacate Underlying Decision with the Clerk of the

United States Court of Appeals for the Federal Circuit via the CM/ECF system,

which will send notice of such filing to all registered CM/ECF users.

/s/  Thomas G. Saunders

THOMAS G. SAUNDERS
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC  20037
(202) 663-6000

June 3, 2026

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because:

1.    The filing has been prepared using a proportionally-spaced typeface and includes 4,195 words.

2.    The filing has been prepared using Microsoft Word for Office 365 in 14-point Times New Roman font.  As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/  Thomas G. Saunders
THOMAS G. SAUNDERS
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC  20037
(202) 663-6000

June 3, 2026